IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WATFORD SPECIALTY INSURANCE COMPANY | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| Plaintiff, | Case No.: |
| v. | |
| MRJC, INC. d/b/a THAT MEETBALL PLACE | |
| Defendant. | |
| and | |
| RICHARD LAROSA and LORI LAROSA | |
| Interested Party Defendants | |
| and | |
| PHILLIP GRIPPO | |
| Interested Party Defendant | |

Plaintiff, WATFORD SPECIALTY INSURANCE COMPANY ("Watford" or "Plaintiff"), by way of Complaint against Defendant, MRJC, INC. d/b/a THAT MEETBALL PLACE ("MRJC" or "Defendant"), by their attorney upon information and belief, respectfully alleges as follows:

**<u>The Parties</u>**

1.     Plaintiff, Watford, is a New Jersey domiciled company with its principal place of business in Morristown, New Jersey.

2.     Upon information and belief, Defendant, MRJC, Inc. d/b/a That Meetball Place, is a New York corporation, with its principal place of business in Patchogue, New York, and is the

owner/operator of That Meetball Place, located at 52-54 West Main Street, Patchogue, New York ("Premises").

3.    Interested Party Defendants, Richard LaRosa and Lori LaRosa ("LaRosa Parties") have been named as interested party defendants in accordance with the provisions of the 28 U.S.C. § 2201 inasmuch as they are parties to an underlying matter with an interest in the outcome of this declaratory judgment action.

4.    Upon information and belief, Interested Party Defendants, the LaRosa Parties, are New York residents, domiciled in New York, residing at 930 Karshick Street, Bohemia New York, 11716 in Suffolk County, New York.

5.    Interested Party Defendant, Phillip Grippo ("Grippo") has been named as an interested party defendant in accordance with the provisions of 28 U.S.C. § 2201, inasmuch as he is a party to an underlying matter with an interest in the outcome of this declaratory judgment action.

6.    Upon information and belief, Interested Party Defendant, Grippo, is a New York resident, domiciled in New York, residing at 1023 Walnut Avenue, Bohemia New York 11716 in Suffolk County, New York.

## Introduction

7.    This is an action by Plaintiff seeking declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, in which Plaintiff seeks a declaration that its obligations in providing insurance coverage to MRJC with respect to two (2) lawsuits: 1) one suit filed on behalf of Plaintiff, Phillip Grippo on July 20, 2020 in the Supreme Court of New York, Suffolk County, bearing Index Number: 609070/2020 ("Grippo Action"); and 2) one suit filed on behalf of Richard and Lori LaRosa, bearing Index Number 618090/2020 ("LaRosa Action").

8.      In the Grippo Action, it is alleged that on or about January 25, 2020, Plaintiff, Phillip Grippo, was a patron at the Premises, which is alleged to be owned and operated by Defendant, MRJC.

9.      It is alleged in the Grippo Action that employees or agents of MRJC and/or other Defendants assaulted Plaintiff at that time.  Moreover, it is alleged that MRJC's alleged negligence in hiring and training its employees and/or agents resulted in Phillip Grippo's injuries.

10.     In the LaRosa Action, Plaintiff, Richard LaRosa, claims that on January 25, 2020, while at the Premises, Richard LaRosa was negligently, intentionally, wrongfully, willfully, maliciously, and with gross negligence, physically detained, assaulted, beaten, and/or falsely arrested by employees of Defendant, MRJC.

11.     Furthermore, it is alleged that MRJC was negligent in their hiring and/or retention of security personnel, which resulted in physical injury to Richard LaRosa, as well as alleged loss of consortium for Lori LaRosa.

12.     MRJC sought a defense and indemnity from Watford under a policy issued by Watford to MRJC in connection to both the Grippo Action and the LaRosa Action (collectively, the "Underlying Actions").

13.     Watford issued to MRJC, Policy No. ERGL00145900, (the "Policy") for the relevant policy term effective December 12, 2019 to December 12, 2020. (A Certified Copy of the Policy is annexed hereto as **Exhibit "A"**).

14.     Watford agreed to provide a defense to MRJC for the Underlying Actions , by virtue of the coverage afforded under an Endorsement for Limited Assault and Battery Related Claims, which contains a per person limit of $500,000 and an aggregate limit of $500,000.

15.     The Watford Policy provides commercial general liability coverage for which the insured agreement states:

**1.    Insuring Agreement**

**a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

16.    The Policy contains an Endorsement, entitled **Assault or Battery Exclusion**, Form

ER 10 5 10 15, which provides in pertinent part:

**This endorsement modifies insurance provided under the following:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

This insurance does not apply to, and we have no duty to defend or indemnify any insured or any other person against, any loss, claim or "suit" for "bodily injury", "property damage", "injury" or "personal and advertising injury", including claims or "suits" for negligence, directly or indirectly, actually or allegedly, arising out of or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution and/or threat, whether committed by any insured, patron, agent, employee, or any other individual.

17.    However, the Watford Policy also contains an Endorsement, entitled **Limited**

**Coverage Assault or Battery Related Claims**, which provides in pertinent part:

**This endorsement modifies insurance provided under the following:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

In consideration of premiums paid, it is agreed that the specific coverage excluded by Form ER 10 05 10 15, Assault or Battery Exclusion is reinstated on a limited basis in accordance with the following additional terms and conditions:

Subject to the limits set forth below this insurance applies to any loss, claim, "suit" or expense for "bodily injury", "property damage", or "personal and advertising injury" including claims or "suits" for negligence, directly or indirectly arising out of, actually or allegedly arising out of, or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution or threat; whether committed by a patron, employee, or any other individual.

This endorsement applies regardless of fault or intent.

For purposes of this endorsement, negligence includes but is not limited to allegations or claims for" negligent hiring, negligent employment, negligent training, negligent supervision, failure to intervene, failure to render aid, failure to contact law enforcement, failure to contact emergency medical services or failure to detain potentially responsible parties.

Solely as to the coverage provided by this endorsement the phrase "These payments will not reduce the limits of insurance" is deleted in its entirety from "SUPPLEMENTARY PAYMENTS-COVERAGES A AND B".

Payments of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suits(s)" to which this endorsement applies shall not exceed the limits of liability set forth below:

| | |
|---|---|
| Per Occurrence: | $500,000 |
| Aggregate Limit: | $500,000 |
| Deductible: | $0.00 |

NOTICE:  The limit of liability available to pay judgment and settlements is reduced by the payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)".  We will not be obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend any loss, claim or "suit" after the applicable limit of our liability has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses.

The Per Occurrence Limit is the most we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in any one claim and/or "suit".  All claims for damages made by one or more persons because of any one act or series of acts to which this endorsement applies shall be deemed to be one claim.

The Aggregate Limit is the most, subject to the Each Occurrence Limit, we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in a claim and/or "suit" regardless of how many persons assert claims and/or "suits" against you, any insured or any person.

The Each Occurrence and Aggregate Limits described above are the most we will pay regardless of the number of insures.  These Limits of Insurance are subject to and not in addition to the General Aggregate Limit shown in the Declarations of the policy.  Payments under these Limits of Insurance are part of and decrease the policy General Aggregate Limit of Insurance shown in the Declarations.

5

**Liquor Liability Assault and Battery Coverage**

If, on the date of an "occurrence" to which this endorsement applies, you had a policy of insurance providing Liquor Liability Coverage with us in full force and effect, Exclusion C. Liquor Liability does not apply, solely with regard to the coverage provided by this endorsement.

**Two or More Coverage Forms**

If this Coverage Form and any other Coverage Form or policy under which you are an insured, issued by us or companies affiliated with us, apply to the same "occurrence", the Per Occurrence and Aggregate Limit shown on this form is the applicable limit for the "occurrence" and SUPPLEMENTARY PAYMENTS-COVERAGES A AND B does not apply.

18.     The Endorsement for Limited Coverage Assault or Battery Related Claims applies to any loss, claim, "suit" or expense for "bodily injury", "property damage", or "personal and advertising injury" including claims or "suits" for negligence, directly or indirectly arising out of, actually or allegedly arising out of, or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution or threat; whether committed by a patron, employee or any other individual.

19.     The coverage for Assault and Battery claims under the Endorsement is subject to a per person limit of $500,000 and an aggregate limit of $500,000.  The aggregate is an eroding limit.

20.     Furthermore, the Watford Policy contains an Endorsement, entitled **Non-Stacking of Limits Endorsement**, which provides in pertinent part:

This endorsement modifies insurance provided under all coverage forms or coverage parts.

If any Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same claim for damages, the maximum Limit of Insurance for Liability Coverage under all of the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable per occurrence or per claim Limit of Insurance available under any one Coverage Form, Coverage Part or policy.

This endorsement does not apply to any Coverage Form, Coverage Part, or policy issued by us or an affiliated company specifically to apply as excess insurance over this policy.

21.     During the policy period December 12, 2019 to December 12, 2020, there were two claims under the Policy arising from an alleged assault and battery – and these claims resulted in the LaRosa Action and the Grippo Action.

22.     As of October 24, 2023, the total payments made under the Watford Policy which have reduced the available limits is approximately $92,249.47.

23.     Thus, the remaining amount available within the aggregate limit of the Watford Policy as of October 24, 2023 is $407,750.53.

24.     As the Underlying Actions is currently ongoing, the remaining available limits are subject to further reduction based upon ongoing expenses in connection with both the LaRosa Action and the Grippo Action.

25.     Plaintiffs' respective counsel in the Underlying Action have advised that their evaluation of damages in Underlying Actions exceed the remaining limits under the Endorsement for Limited Coverage for Assault and Battery Related Claims.

26.     Therefore, in the interest of protecting its insured, MRJC, Watford now seeks a judicial declaration of its rights and responsibilities under the Policy with respect to availability of coverage for the LaRosa Action and the Grippo Action.

**Jurisdiction and Venue**

27.     This is an action for declaratory relief, for which this Court has jurisdiction subject to the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

28.     An actual controversy exists between the parties as to their respective rights, duties, and obligations, if any, under an insurance policy issued by Watford under which MRJC is the named insured.

29.    This Court has jurisdiction because the amount in controversy exceeds $75,000, and the parties comply with the requirements for diversity jurisdiction, based on information available to Plaintiff at this time.

30.    This Court has personal jurisdiction over the Defendant, MRJC, as MRJC is a New York corporation, with its principal place of business in Suffolk County, New York, and is the owner/operator of the Premises, which is located in Suffolk County, New York.

31.    This Court has personal jurisdiction over each of the Interested Party Defendants, as all Interested Party Defendants are residents of Suffolk County, New York.

32.    Venue is proper based on the residences of the Interest Party Defendants in Suffolk County, New York. Further, venue is proper based on Defendant, MRJC's principal place of business being located in Suffolk County, New York, and their operation of the Premises in Suffolk County, New York.

## Count I

### Declaratory Judgment

**Watford Has No Obligations Under the Watford Policy Once the Applicable Limit of Liability Has Been Exhausted by Payment of Judgments, Settlements, Defense Costs or Loss Adjustment Expenses**

33.    Watford incorporates all the preceding paragraphs of this complaint as though fully set forth herein.

34.    The Watford Policy contains an Endorsement entitled Limited Coverage Assault or Battery Related Claims, which provides in pertinent part:

> In consideration of premiums paid, it is agreed that the specific coverage excluded by Form ER 10 05 10 15, Assault or Battery Exclusion is reinstated on a limited basis in accordance with the following additional terms and conditions:
>
> Subject to the limits set forth below this insurance applies to any loss, claim, "suit" or expense for "bodily injury", "property damage", or "personal and advertising injury" including claims or "suits" for negligence, directly or indirectly arising out of, actually or allegedly arising out of, or related to

8

any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution or threat; whether committed by a patron, employee, or any other individual.

This endorsement applies regardless of fault or intent.

For purposes of this endorsement, negligence includes but is not limited to allegations or claims for" negligent hiring, negligent employment, negligent training, negligent supervision, failure to intervene, failure to render aid, failure to contact law enforcement, failure to contact emergency medical services or failure to detain potentially responsible parties.

Solely as to the coverage provided by this endorsement the phrase "These payments will not reduce the limits of insurance" is deleted in its entirety from "SUPPLEMENTARY PAYMENTS-COVERAGES A AND B".

Payments of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suits(s)" to which this endorsement applies shall not exceed the limits of liability set forth below:

| | |
|---|---|
| Per Occurrence: | $500,000 |
| Aggregate Limit: | $500,000 |
| Deductible: | $0.00 |

NOTICE:  The limit of liability available to pay judgment and settlements is reduced by the payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)".  We will not be obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend any loss, claim or "suit" after the applicable limit of our liability has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses.

The Per Occurrence Limit is the most we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in any one claim and/or "suit".  All claims for damages made by one or more persons because of any one act or series of acts to which this endorsement applies shall be deemed to be one claim.

The Aggregate Limit is the most, subject to the Each Occurrence Limit, we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in a claim and/or "suit" regardless of how many persons assert claims and/or "suits" against you, any insured or any person.

The Each Occurrence and Aggregate Limits described above are the most we will pay regardless of the number of insureds.  These Limits of Insurance

are subject to and not in addition to the General Aggregate Limit shown in the Declarations of the policy.  Payments under these Limits of Insurance are part of and decrease the policy General Aggregate Limit of Insurance shown in the Declarations.

**Liquor Liability Assault and Battery Coverage**

If, on the date of an "occurrence" to which this endorsement applies, you had a policy of insurance providing Liquor Liability Coverage with us in full force and effect, Exclusion C. Liquor Liability does not apply, solely with regard to the coverage provided by this endorsement.

**Two or More Coverage Forms**

If this Coverage Form and any other Coverage Form or policy under which you are an insured, issued by us or companies affiliated with us, apply to the same "occurrence", the Per Occurrence and Aggregate Limit shown on this form is the applicable limit for the "occurrence" and SUPPLEMENTARY PAYMENTS-COVERAGES A AND B does not apply.

35.     The Endorsement for Limited Coverage Assault or Battery Related Claims provides coverage for Assault and Battery claims with a per person limit of $500,000 and an aggregate limit of $500,000.

36.     The aggregate limit of $500,000 is an eroding limit.

37.     The limit of liability available to pay judgment and settlements under the Watford Policy is reduced by the payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)".

38.     Watford is not obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend any loss, claim or "suit" after the applicable limit of our liability has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses.

39.     The Grippo Action alleges that on or about January 25, 2020, Plaintiff, Phillip Grippo, was a patron at the Premises, which is alleged to be owned and operated by Defendant, MRJC.

10

40.     It is alleged in the Grippo Action that an employee and/or agent of MRJC assaulted Plaintiff at that time.  Moreover, it is alleged that MRJC's alleged negligence in hiring and training its employees and/or agents resulted in Phillip Grippo's injuries.

41.     Accordingly, the coverage afforded to MRJC under the Watford Policy in connection with the Grippo Action is pursuant to the terms and conditions of the Endorsement for Limited Coverage Assault or Battery Related Claims.

42.     In the LaRosa Action, Plaintiff, Richard LaRosa, claims that on January 25, 2020, while at the Premises, Richard LaRosa was negligently, intentionally, wrongfully, willfully, maliciously, and with gross negligence, physically detained, assaulted, beaten, and/or falsely arrested by employees of Defendant, MRJC.

43.     Furthermore, it is alleged that MRJC was negligent in their hiring and/or retention of security personnel, which resulted in physical injury to Richard LaRosa, as well as alleged loss of consortium for Lori LaRosa.

44.     Thus, the coverage afforded to MRJC under the Watford Policy in connection with the LaRosa Action is pursuant to the terms and conditions of the Endorsement for Limited Coverage Assault or Battery Related Claims.

45.     Further, subject to the eroding limits, the per Occurrence and Aggregate Limits in the Endorsement for Limited Coverage Assault or Battery Related Claims is the most Watford must pay in connection with the Grippo Action and/or the LaRosa Action.

46.     Watford is not obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend the the LaRosa Action and/or the Grippo Action after the applicable limit of liability has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses.

47.     There is an actual and justiciable controversy between the parties, which may be determined by a judgment or order of this Court.

48.     This Court has the power to declare and adjudicate the rights and liabilities of the parties hereto under the terms and provisions of the policy of insurance referred to herein and to adjudicate the final rights of all parties and give such other and further relief as may be necessary to enforce the same.

WHEREFORE, the Plaintiff, Watford, prays that this Court enter judgment finding and declaring the rights of the parties as follows:

A.     Declaring that the Watford Policy does not afford coverage to MRJC in connection with the LaRosa Action and the Grippo Action except under the Endorsement for Limited Coverage Assault or Battery Related Claims;

B.     Declaring that, subject to the eroding limits, the per Occurrence and Aggregate Limits in the Endorsement for Limited Coverage Assault or Battery Related Claims is the most Watford must pay in connection with the LaRosa Action and/or the Grippo Action.

C.     Declaring that Watford will not be obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend any loss, claim or "suit" after the per Occurrence and Aggregate Limits in the Endorsement for Limited Coverage Assault or Battery Related Claims has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses;

D.     Awarding Watford costs and attorneys' fees and Watford is entitled to such other and further relief as the Court deems fit and just under the circumstances.

Dated:       New York, New York
              January 16, 2024

                                      GOLDEN, ROTHSCHILD, SPAGNOLA,
                                      LUNDELL, BOYLAN, GARUBO, & BELL P.C.

                                By:/s/ Eric S. Schlesinger_____
                                      ERIC S. SCHLESINGER, ESQ.
                                      Attorneys for PLAINTIFF
                                      WATFORD   SPECIALTY   INSURANCE
                                      COMPANY
                                      40 Exchange Place,
                                      19th Floor, Suite 1900
                                      New York, New York 10005
                                      (212) 964-0120
                                      --------------
                                      1011 Route 22 West, Suite 300
                                      Bridgewater, New Jersey 08807
                                      (908) 722-6300

# EXHIBIT A



Watford Specialty Insurance Company

PROGRAM ADMINISTRATOR

Entertainment Risk
6300 N Sagewood Drive
Suite H-251
Park City, UT 84098

General Inquiry: info@entertainmentrisk.com
Claim Reporting: entertainmentclaims@tritonclaims.com
844-368-7475

**THE INSURER NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER, NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE DEPARTMENT OF FINANCIAL SERVICES PERTAINING TO POLICY FORMS.**

In the event you need additional information or have a general inquiry, please call the Program Administrator listed above.

WATFORD000001

POLICY NUMBER: ERGL00145900                                    Form: ER CPD 07 17

# COMMON POLICY DECLARATIONS

| **Watford Specialty Insurance Company**<br>**445 South Street**<br>**Suite 220**<br>**P.O. Box 1988**<br>**Morristown, NJ 07962-1988**<br>**877-590-5611** | **Rockwell Group Ltd**<br>**640 Fulton Street Suite-4**<br>**Farmingdale, NY 11735**<br>**516-454-6364** |
|---|---|

NAMED INSURED:       MRJC, Inc. DBA: That Meetball Place

MAILING ADDRESS:     52-54 West Main St., Patchogue, NY 11772

POLICY PERIOD:   FROM 12-12-2019          TO 12-12-2020          AT 12:01 A.M. STANDARD

| LOCATION OF BUSINESS: | SEE FORM: ER 10 34 04 14 |
|---|---|
| BUSINESS DESCRIPTION: | Lounge |
| THE NAMED INSURED IS A: | Organization |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

|  | PREMIUM |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ ▮▮▮▮▮ |
| LIQUOR LIABILITY COVERAGE PART | $ ▮▮▮▮ |
| COMMERCIAL PROPERTY COVERAGE PART | $ Not Included |
| TERRORISM RISK INSURANCE ACT COVERAGE | $ Not Included |
| POLICY FEE | $ |
| INSPECTION FEE | $ |
| SURPLUS LINES TAX | $ |
| SURPLUS LINES ASSOCIATION FEE | $ |
| **TOTAL ADVANCE PREMIUM:** | $ |

Premium shown is payable: AT INCEPTION

ER CPD 07 17          Includes copyrighted material of Insurance Services Office, Inc.          Page 1 of 2   □
                                      with its permission

---



**This is to  certify that Excess Line Association of New York received and reviewed the attached insurance document in accordance with Article 21 of the New York State Insurance Law**

01/09/2020
Id:1271621901

**THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE DEPARTMENT OF FINANCIAL SERVICES PERTAINING TO POLICY FORMS.**

WATFORD000002

POLICY NUMBER: ERGL00145900        **Form: ER CPD 07 17**

# COMMON POLICY DECLARATIONS

| | |
|---|---|
| **Watford Specialty Insurance Company**<br>**445 South Street**<br>**Suite 220**<br>**P.O. Box 1988**<br>**Morristown, NJ 07962-1988**<br>**877-590-5611** | **Rockwell Group Ltd**<br>**640 Fulton Street Suite-4**<br>**Farmingdale, NY 11735**<br>**516-454-6364** |

NAMED INSURED:    MRJC, Inc. DBA: That Meetball Place

MAILING ADDRESS:    52-54 West Main St., Patchogue, NY 11772

POLICY PERIOD:   FROM 12-12-2019       TO 12-12-2020       AT 12:01 A.M. STANDARD

| | |
|---|---|
| LOCATION OF BUSINESS: | **SEE FORM: ER 10 34 04 14** |
| BUSINESS DESCRIPTION: | Lounge |
| THE NAMED INSURED IS A: | Organization |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

| | PREMIUM |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ ▓▓▓▓▓ |
| LIQUOR LIABILITY COVERAGE PART | $ ▓▓▓▓▓ |
| COMMERCIAL PROPERTY COVERAGE PART | $ Not Included |
| TERRORISM RISK INSURANCE ACT COVERAGE | $ Not Included |
| POLICY FEE | $ ▓▓▓▓▓ |
| INSPECTION FEE | $ ▓▓▓▓▓ |
| SURPLUS LINES TAX | $ ▓▓▓▓▓ |
| SURPLUS LINES ASSOCIATION FEE | $ ▓▓▓▓▓ |
| **TOTAL ADVANCE PREMIUM:** | $ ▓▓▓▓▓ |

Premium shown is payable: AT INCEPTION

WATFORD000003

| **FORMS APPLICABLE TO ALL COVERAGE PARTS:** |
|---|
| **REFER TO FORM: ER SCF 04 14** |

THESE DECLARATIONS TOGETHER WITH THE COVERAGE PART DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORMS AND ANY ENDORSEMENTS COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

WATFORD000004

POLICY NUMBER:  ERGL00145900                                                    **ER SCF 04 14**

## Common Policy Forms

| | |
|---|---|
| ER PC NY 07 17 | Policy Cover Page-NY |
| ER CPD 07 17 | Common Policy Declarations |
| ER SCF 04 14 | Schedule of Common Forms |
| WIC AUTO 0058 CW (05 17) | US Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory Notice To Policyholders |
| ER IL 01 09 16 | Common Policy Conditions |
| CG 24 02 12 04 | Binding Arbitration |
| ER 10 03 04 14 | Amusement Devices Exclusion |
| ER 10 05 10 15 | Assault or Battery Exclusion |
| ER 10 06 04 14 | Athletic Participants Exclusion |
| ER 10 19 04 14 | Punitive Damages Exclusion |
| ER 10 34 04 14 | Limitation of Coverage-Designated Premises or Project |
| ER 10 35 04 14 | Classification Limitation |
| ER IL 04 03 19 | In Witness Clause |
| ER IL 06 07 14 | Non-Stacking of Limits Endorsement |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| CG 21 73 01 15 | Exclusion of Certified Acts of Terrorism |
| ER 10 02 04 14 | Injury to Performers Exclusion |
| ER 10 14 04 14 | Designated Promotions Exclusion |
| ER 10 17 04 14 | Projectiles Exclusion |
| ER 10 22 08 18 | Cyber Liability Exclusion |
| ER 10 31 04 14 | Stunt Activity Exclusion |
| ER AI 08 04 14 | Additional Insured-Managers or Lessors of Premises |
| ER DWP 03 19 | Deadly Weapon Protection Endorsement |
| ER CYBER 01 19 | Cyber Liability Endorsement |

Page **1** of **1**

WATFORD000005

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Trea- sury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

WATFORD000006

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMON POLICY CONDITIONS

**All Coverage Parts included in this policy are subject to the following conditions:**

**A. Cancellation and Non-Renewal**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel or non-renew this policy by issuing written notice of cancellation or non-renewal in accordance with the excess or surplus lines laws of the state in which this policy is delivered.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

**1.** We have the right to:

   **a.** Make inspections and surveys at any time;

   **b.** Give you reports on the conditions we find; and

   **c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   **a.** Are safe or healthful; or

   **b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification under state or municipal statutes, ordinances or regulation of boilers, pressure vessels or elevators.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000007

5. You are required to comply with any written recommendations for any "discrepancy" described and detailed in a Compliance Safety Accountability Letter ("CSA") that is delivered to you, within the requested timespan.

    a. For the purpose of this insurance, "discrepancy" shall mean any on premises conflict, variation or disparity between law, regulation, standard, ordinance, rule, guideline, code or otherwise, governing or adopted for the designated premises and the design, construction, maintenance, operation or use of the designated premises of the insured which creates a material change in risk.

6. We have the right to suspend coverage afforded to you under this Policy specifically for a designated "discrepancy" on the CSA delivered to you, for your failure to comply within the requested timespan.

    a. A notice of suspension, accompanied with the exclusion that has been endorsed onto the Policy, will be mailed to the address found on the Declarations page of the Policy.

    b. The notice of suspension will include:
        i. The date suspension began;
        ii. A description of "discrepancy" coverage has been suspended for; and
        iii. Copies of all CSA's delivered to you.

7. Suspended coverage for a "discrepancy", may be reinstated upon compliance verification by us. A reinstatement notice, accompanied with the applicable endorsement removing the exclusion from the Policy, will be delivered to you.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay; and

3. Is responsible for all deductibles or self-insured retention amounts.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**G. Premium Basis**

One or more of the following symbols may be entered under the Premium Basis/Base column of the Coverage Part Declarations. These symbols designate the basis used for determining your premium. The following is a definition of these symbols when used as a premium basis.

Symbol   Definition

  a     "Admissions" means:
          The total number of persons, other than employees of the Named Insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes. The rates apply per 1,000 admissions.

  b     "Area" means:
          The total number of square feet of floor space at the insured premises, computed as follows:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000008

1. For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:
   a. Courts and mezzanine types of floor openings.
   b. Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.

2. For tenants, determine the area they occupy in the same manner as for the entire buildings.

3. The rates apply per 1,000 square feet of area.

c    "Total Cost" means:
     The total cost of all work let or sublet in connection with each specific project including:
   1. The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; however, do not include the cost of finished equipment installed but not furnished by the subcontractor if the subcontractor does no other work on or in connection with such equipment; and

   2. All fees, bonuses or commissions made, paid or due.

   3. The rates apply per $1,000 of total cost.

e    "Each" means:
     A quantity comprising one unit of exposure as described in the classification description.

p    "Payroll" means:
   1. Remuneration which including money or substitutes for money.

   2. Payroll includes:
   a. Commissions, bonuses, pay for holidays, vacations or periods of illness;
   b. Extra pay for overtime in accordance with the manuals in use by us;
   c. Payments by an employer of amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;
   d. Payments to employees on any basis other than time worked, such as piecework, profit sharing or incentive plans;
   e. Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations for the insured;
   f. The rental value of an apartment or a house provided for an employee based on comparable accommodations;
   g. Value of meals and lodging other than an apartment or house received by employees as part of their pay;
   h. The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;
   i. The payroll of mobile equipment operators and their helpers, whether or not the operators are designated or licensed to operate automobiles. If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;
   j. The payroll of executive officers and individual insureds and co-partners in accordance with the manuals in use by us;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000009

    k. Fees paid to employment agencies for temporary personnel provided to the insured; and

    l. 90% of fees to personnel leasing firms for workers provided to the insured.

3. Payroll does not include:

    a. Tips and other gratuities received by employees;

    b. Payments by an employer to group insurance or group pension plans for employees in accordance with the manuals in use by us;

    c. The value of special rewards for individual invention or discovery;

    d. Dismissal or severance payments except for time worked or accrued vacation;

    e. The payroll of clerical office employees;

    f. The payroll of salespersons, collectors or messengers who work principally away from the insured's premises. Salespersons, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer;
This term does not apply to any employee whose duties include the delivery of any merchandise handled, treated or sold.

    g. The payroll of drivers and their helpers if their principal duties are to work on or in connection with automobiles; and

    h. The payroll of aircraft pilots or co-pilots if their principal duties are to work on or in connection with aircraft in either capacity.

4. The rates apply per $1,000 of payroll.

s      "Gross Sales" means:

1. The gross amount charged by the Named Insured, concessionaires of the Named Insured or by others trading under the insured's name for:

    a. All goods or products, sold or distributed;

    b. Operations performed during the policy period;

    c. Rentals; and

    d. Dues or fees.

2. Inclusions
The following items shall not be deducted from gross sales

    a. Foreign exchange discounts;

    b. Freight allowance to customers;

    c. Total sales of consigned goods and warehouse receipts;

    d. Trade or cash discounts;

    e. Bad debts; and

    f. Repossession of items sold on installments (amount actually collected).

3. Exclusions
The following items shall be deducted from gross sales:

    a. Sales or excise taxes which are collected and submitted to a governmental division;

    b. Credits for repossessed merchandise and products returned.  Allowances for damages and spoiled goods;

    c. Finance charges for items sold on installments;

    d. Freight charges on sales if freight is charged as a separate item on customers invoice; and

    e. Royalty income from patent rights or copyrights which are not product sales.

4. The rates apply per $1,000 of gross sales.

**H. Calculation of Premium**

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000010

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

I. **Minimum Earned Premium**

This policy is subject to a "minimum earned premium". "Minimum earned premium" means the total policy premium.

Audits will not reduce the "minimum earned premium". The due date for audit premiums is the date shown as the due date on the bill.  If after our request you fail to supply us with the necessary information to accurately complete an audit you will be charged an assumed audit rate of 25% of the "minimum earned premium".  Additional premium developed by audit is deemed 100% earned.

**J. Cancellation and Minimum Earned Premium**

1. If you cancel this policy, the return premium will be 90% of the pro rata balance of any remaining unearned premium but no less than 25% of the "minimum earned premium".

2. If we cancel the policy for any reason, other than for non-payment of premium, the "minimum earned premium" shall not apply. We will return to you the pro rata amount of the unearned premium.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000011

**COMMERCIAL GENERAL LIABILITY**
**CG 24 02 12 04**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BINDING ARBITRATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

If we and the insured do not agree whether coverage is provided under this Coverage Part for a claim made against the insured, then either party may make a written demand for arbitration.

When this demand is made, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will:

**1.** Pay the expenses it incurs; and

**2.** Bear the expenses of the third arbitrator equally.

Unless both parties agree otherwise, arbitration will take place in the county or parish in which the address shown in the Declarations is located. Local rules of law as to procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

WATFORD000012

Form: ER 10 03 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMUSEMENT DEVICES EXCLUSION

**This endorsement modifies insurance provided under the following:**

> **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
> **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal injury and advertising injury", actually or allegedly resulting directly or indirectly from the ownership, maintenance, instruction, supervision or use of "amusement devices".

For the purpose of this insurance, "amusement devices" shall include, but not be limited to:

(a) Any device or apparatus which jostles, bucks or in any similar fashion, moves, or is intended to move, or;

(b) Any mechanical riding devices, including but not limited to, a mechanical bull, steer, shark, surf board, skate board or horse, or;

(c) Any device which requires the user to punch, kick, or strike the device, or;

(d) Dunk tanks, Climbing walls, Trampolines, Inflatables, Playground equipment.

All other terms and conditions shall remain unchanged.

WATFORD000013

Form: ER 10 05 10 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ASSAULT OR BATTERY EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to, and we have no duty to defend or indemnify any insured or any other person against, any loss, claim or "suit" for "bodily injury", "property damage", "injury" or "personal and advertising injury", including claims or "suits" for negligence, directly or indirectly, actually or allegedly, arising out of or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution and/or threat, whether committed by any insured, patron, agent, employee, or any other individual.

This exclusion applies regardless of fault or intent.

For purposes of this exclusion, negligence includes but is not limited to allegations or claims for: negligent hiring, negligent employment, negligent training, negligent supervision, the failure to intervene, the failure to render aid, the failure to contact law enforcement, the failure to contact emergency medical services or the failure to detain potentially responsible parties.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000014

Form: ER 10 06 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ATHLETICS OR SPORTS PARTICIPANTS EXCLUSION

**This endorsement modifies insurance provided under the following:**

> **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
> **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage", "injury" or "personal injury and advertising injury" to any person practicing for or participating in any sports or athletic contest or exhibition.

Page **1** of **1**

WATFORD000015

Form: ER 10 19 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PUNITIVE DAMAGES EXCLUSION

**This endorsement modifies insurance provided under the following:**

> **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
> **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to:

1. Punitive or exemplary damages;

2. Fines;

3. Penalties;

4. Treble damages; or

5. Multiplied or multiple damages;

imposed upon any "insured" including any defense or legal expenses incurred as a result of items 1., 2., 3., 4. or 5., above.

WATFORD000016

Form: ER 10 34 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE-DESIGNATED PREMISES OR PROJECT

**This endorsement modifies insurance provided under the following:**

**GENERAL LIABILITY COVERAGE PART**

**LIQUOR LIABILITY COVERAGE PART**

**SCHEDULE**

| **Premises:** |
| --- |
| 1. 52-54 West Main St., Patchogue, NY 11772 |
| **Project:** |
|  |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and "injury" arising out of:

1. The ownership, maintenance or use of the premises shown in the SCHEDULE and operations necessary or incidental to those premises; or

2. The project shown in the SCHEDULE.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Page **1** of **1**

Form: ER 10 35 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CLASSIFICATION LIMITATION

**This endorsement modifies insurance provided under all coverage parts.**

This insurance is specifically limited to those classification codes listed in the policy. No coverage is provided for, and this insurance does not apply to, any classification code or operation performed by any Named Insured not specifically listed in the Declarations of this policy.

Page **1** of **1**

WATFORD000018

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# IN WITNESS CLAUSE

It is hereby agreed and understood that the following in Witness Clause supersedes any and all other in Witness clauses in this policy.

In Witness Whereof, the Company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless countersigned by an authorized representative of the Company, where required.

For:
**Watford Specialty Insurance Company**
**445 South Street**
**Suite 220**
**PO Box 1988**
**Morristown, NJ 07962-1988**

Alexandre Jean Marie Scherer
President & CEO

Anna DeChristofano
Corporate Secretary

**FORM: ER IL 06 07 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NON-STACKING OF LIMITS ENDORSEMENT
## TWO OR MORE COVERAGE FORMS, COVERAGE PARTS OR POLICIES ISSUED BY US

**This endorsement modifies insurance provided under all coverage forms or coverage parts.**

If any Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same claim for damages, the maximum Limit of Insurance for Liability Coverage under all of the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable per occurrence or per claim Limit of Insurance available under any one Coverage Form, Coverage Part or policy.

This endorsement does not apply to any Coverage Form, Coverage Part, or policy issued by us or an affiliated company specifically to apply as excess insurance over this policy.

WATFORD000020

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

WATFORD000021

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007

WATFORD000022

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2014

WATFORD000023

Form: ER 10 02 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# INJURY TO PERFORMERS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal and advertising injury" arising directly or indirectly to "performers".

This exclusion applies to "bodily injury", "property damage", "injury" or "personal and advertising injury" which occurs during or out of the preparation, rehearsal, performance or breakdown activities or as a result thereof.  This exclusion applies whether or not the performer receives any form of compensation.

"Performers" means: persons or organizations who are entertainers or talent participating or performing in any concert, dance, show, exhibition, adult entertainment or adult performance of any nature and any staff, employees, agents, family, security or guests of the entertainer or talent.

WATFORD000024

Form: ER 10 14 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED PROMOTIONS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any claim, loss, "suit", "bodily injury", "property damage", "injury" or "personal injury and advertising injury" actually or allegedly arising directly or indirectly from, or resulting in whole or in part out of, or resulting in whole or in part from the use of, failure to use, or is based upon or attributable to:

1. Drinking games, including, but not limited to, beer pong, flip cup, funneling, or any game which may lead to the over consumption of alcohol; or
2. Any event where your employees, agents or patrons voluntarily spray large quantities of liquids into or onto crowds and/or groups of patrons including, but not limited to, champagne wars; or
3. Foam parties, including, but not limited to, the manufacturing and delivering of foam or similar substance into or onto all or a portion of the premises while patrons are present; or
4. The use of liquid nitrogen; or
5. Any beverage which has been ignited prior to consumption.

WATFORD000025

Form: ER 10 17 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROJECTILES EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any claim, loss, "suit", "bodily injury", "property damage", "injury" or "personal and advertising injury", actually or allegedly resulting directly or indirectly from any person, projectile or object propelled into or onto a crowd by any insured, an agent of any insured, or a contractor of any insured.

WATFORD000026

**Form: ER 10 22 08 18**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CYBER LIABILITY

This endorsement modifies and amends insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

A. This insurance does not apply to any liability arising out of:

1. any "bodily injury", "property damage", "personal and advertising injury" or liability arising out of "cyber injury;" or

2. any loss, cost or expense arising out of any:

a. request, demand, order or statutory or regulatory requirement that any insured or others; monitor, notify or in any way respond to an actual or alleged "cyber injury;"

b. claim or suit by or on behalf of a governmental authority for damages because of monitoring, notifying or in any way responding to a "cyber injury;"

incurred by you or others.

B. The following are added to SECTION V – DEFINITIONS:

1. "Cyber injury" means any actual or suspected, intentional or unintentional breach of any data, software or hardware, wherever located, that results in:

a. loss; destruction; disclosure; disruption; inspection; modification; recording; release; review; or use of "personal information;"

b. inability to access any website or any electronic system;

c. release, introduction or facilitation of any "malicious code;"

d. forensic or investigative expenses;

e. extortion or terrorism acts or threats;

f. monitoring or notification costs or expenses;

g. crisis management or public relations expenses;

h. data or system recovery, repair, replacement or restoration expenses; or

i. business interruption expenses.

2. "Malicious code" includes, but is not limited to any virus, Trojan horse, worm, spyware, logic bomb, adware, malware or other similar software program.

3. "Personal information" means any personal, or personally identifiable, or identifying, information, as defined by federal, state or local laws, statutes or regulations.  "Personal information" includes, but is not limited to, a person or entity's likeness, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information, birth dates, addresses, social security number, or any other type of non-public information.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

Page **1** of **1**

Form: ER 10 31 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# STUNT ACTIVITY EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal and advertising injury" arising directly or indirectly or in any way related to "stunt activity".

"Stunt activity" means: any activity, feat or trick requiring special skills, expertise, device or daring.

WATFORD000028

**FORM: ER AI 08 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**LIQUOR LIABILITY COVERAGE PART**

**SCHEDULE**

| **Designation Of Premises (Part Leased To You):** |
|---|
| 1. 52-54 West Main St., Patchogue, NY 11772 |

| **Name Of Person(s) Or Organization(s) (Additional Insured):** |
|---|
| 1. MSC Properties IV, Inc., 52-54 West Main St., Patchogue, NY 11772 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organization(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are

required by the contract or agreement to provide for such additional insured.

**3.** The person(s) or organization(s) shown in the Schedule are an additional insured(s) solely with respect to liability imposed or sought to be imposed on the person(s) or organization(s) due to the actual or alleged acts or omissions of a Named Insured.  This insurance does not apply to any liability or damages imposed or sought to be imposed on any additional insured due to the actual or alleged acts or omissions of the additional insured, their employee's, agent's or contractor's.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**Page 1 of 1**

WATFORD000029

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**Page 2 of 2**

ER DWP 03 19

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEADLY WEAPON PROTECTION ENDORSEMENT

### WHAT TO DO FOLLOWING A DEADLY WEAPON EVENT

If a Deadly Weapon Event occurs, or is believed to have occurred, contact the Event Responder via the Crisis Management Response Team on:

**Telephone Number:  860 - 677 - 3790** (Crisis Risk Strategies, LLC)

In consideration of the payment of premium stated in the **declarations**, the policy to which this Endorsement is attached and forms a part is amended to provide Deadly Weapon Protection insurance to the Named Insured, in accordance with all of the terms, conditions, and limitations of the policy to which this Endorsement is attached and to any specific terms, conditions, exclusions and definitions contained in this Endorsement.  In the event that any of the terms, conditions, exclusions, and definitions contained in this Endorsement may conflict with those of the policy to which the Endorsement is attached, then the terms, conditions, exclusions and definitions of this Endorsement shall take precedence to the extent of such conflict.

### LIMIT OF LIABILITY:

**Loss Occurrence Limit of Liability: <u>USD 250,000</u>**

**Aggregate Limit of Liability: <u>USD 250,000</u>**

**We** shall not be liable under this Endorsement for more than the amount stated above as "Loss Occurrence Limit of Liability" in respect of each and every **loss occurrence** of a **deadly weapon event**, regardless of the number of Coverage Parts involved in such **loss occurrence**, and nor for more than the amount stated above as "Aggregate Limit of Liability" in the **aggregate** during the **period of insurance**.

### SUBLIMIT(S) OF LIABILITY:

This Endorsement contains Sublimit(s) of Liability which are applicable to certain specific Coverage Parts.  Any applicable Sublimit(s) of Liability are stipulated within each relevant Coverage Part of this Endorsement.  **We** shall not be liable for more than the amount of any applicable Sublimit of Liability for any Coverage Part for which there is a Sublimit of Liability so stipulated.  Each Sublimit of Liability is a part of, and not in addition to, this Endorsement's Limit of Liability for each **loss occurrence. Furthermore**, each Sublimit of Liability of any Coverage Part is also part of, and not in addition to, the **aggregate** Limit of Liability of this Endorsement.

WATFORD000031

ER DWP 03 19

**<u>DEDUCTIBLE:</u>**

Each **loss occurrence** insured under this Endorsement shall be adjusted separately, and from the amount of each such adjusted **loss occurrence** the sum of <u>USD 2,500</u> shall be deducted regardless of the number of Coverage Parts involved in such **loss occurrence**.

**<u>OTHER CONDITIONS APPLYING TO ALL COVERAGE PARTS</u>:**

The insurance afforded to **you** under this Endorsement will act as primary insurance to any other insurance carried by or available to **you**.

In any claim for loss, damage, cost or expense, and in any action, suit or other proceeding to enforce such a claim under this Endorsement, the burden of proving that such loss is not excluded from this Endorsement, or that **you** are not in breach of any of its conditions, will be upon **you**.

Words written in **bold** are defined terms in the Endorsement, so please refer to the General Definitions section of this Endorsement, and to the Definitions heading of each Coverage Part of this Endorsement, to see the meaning of these terms.

**This Endorsement provides the insurance described in the Coverage Parts 1 to 7 below.**

## General Definitions

An explanation of what words mean. These words will have the same meaning wherever they appear in bold letters anywhere within this Endorsement.

| Aggregate | **Aggregate** means the total amount of indemnity for any and all loss, damage, liability, cost and expense incurred by **you**, or incurred on **your** behalf, during the **period of insurance**, under all Coverage Parts of this Endorsement regardless of the number of **deadly weapon event(s)** which may occur during that period.  The **aggregate** amount will be inclusive of any Sublimit(s) of Liability stated in the Endorsement and will be eroded by any claim or loss paid by **us**. |
|---|---|
| Assailant | **Assailant** means an individual, or group of individuals, actively engaged in, or assisting in, killing or attempting to kill a person or persons using a **weapon**. |
| Bodily Injury | **Bodily injury** means death, physical injury, sickness, disease or disability to an **insured person** resulting from a **deadly weapon event** excluding, however, the **assailant(s)** of the **deadly weapon event**. |
| Business Services | **Business services** mean the rendering of services as performed by **you** at **your location(s)**. |
| Consequential Loss | **Consequential loss** means any loss, damage, liability, cost or expense, incurred during a sequence of events, conditions or happenings beginning with a **deadly weapon event**, when that loss, damage, liability, cost or expense arises as a result of, or following, an intervening cause of loss which is excluded by this Endorsement. |

WATFORD000032

ER DWP 03 19

| | |
|---|---|
| **Crisis Management Response Team** | **Crisis management response team** means a team of qualified professionals formed by **us** who respond to a qualifying event in order to provide assistance, guidance and resources to **you** during or immediately following the event. The **crisis management response team** operates in accordance with plans and protocols developed by **us**.  Services may include, but are not limited to: public relations, media management, legal, crisis counselling to **you**, site security, remediation and recovery, restoration and similar services. |
| **Deadly Weapon Event** | **Deadly weapon event** means any event involving an **assailant** where a **weapon** has been used by the **assailant** in or on any **location(s)** which causes **bodily injury** and/or physical loss or physical damage to **your** property. |
| **Declarations** | **Declarations** mean the attachment to the policy to which this Endorsement is attached which sets out **your** details. |
| **Event Responder** | **Event responder** means a U.S. based risk management entity that operates in safety and security, emergency preparedness, disaster management and public safety consulting services, and which is accessible via the **crisis management response team**. |
| **Immediate Family Member** | **Immediate family member** means a person who is related to the **insured person(s)** in any of the following ways:  Spouse, brother-in-law, sister-in-law, daughter–in-law, son-in-law, mother-in-law, father-in-law, parent (includes stepparent), brother or sister (includes stepbrother or stepsister), or child (includes legally adopted or stepchild). **Immediate family member** also includes a person who is a legal guardian of the **insured person(s)**. |
| **Insured Person(s)** | **Insured person(s)** means any human third party individual(s) and employee(s), who is in or on a **location(s)**, except when specifically excluded under this insurance. |
| **Joint Venture(s)** | **Joint venture** means a co-venture, joint lease, joint operating agreement or partnership in which **you** have a financial interest. |
| **Location(s)** | **Location(s)** means all of **your** locations which are owned, leased or are part of a **joint venture** where **business services** are rendered and which have been listed and provided to **us** prior to binding coverage. |
| **Loss Occurrence** | **Loss occurrence** means any loss, damage, cost or expense incurred by **you**, or incurred on **your** behalf, which arises from, is consequent upon, or is attributable to the same, or substantially similar, cause of loss or originating source, regardless of the number of **location(s)** and **assailant(s)** involved in the loss. |

WATFORD000033

ER DWP 03 19

| Period of Insurance | **Period of insurance** means the period of time between the inception date of this insurance and the expiration date (or effective date of termination or cancellation of this insurance, if applicable). |
|---|---|
| **Pollutant or Contaminant** | **Pollutant or contaminant** includes, but is not limited to, any solid, liquid, gaseous or thermal irritant, contaminant or toxic or hazardous substance or any substance the presence, existence, or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment. |
| **Road Vehicle** | **Road vehicle** means a private or commercial land-based vehicle which is licensed for use on public roads, including automobiles, buses, trucks or motorcycles. |
| **We/Us/Our** | The company providing this insurance. |
| **Weapon** | **Weapon** means: <br><br> a.  Any portable or handheld device, instrument or substance which is used by the **assailant(s)** in a manner to deliberately cause death or bodily injury; and/or <br><br> b.  Any **road vehicle** that is occupied and used by the **assailant(s)** to deliberately cause death or bodily injury. <br><br> Notwithstanding the foregoing, **weapon** does not, however, include any of the following: <br><br> i.   Any vehicle not defined as a **road vehicle**; <br><br> ii.  Any weapon mounted (or designed to be mounted) on a vehicle; <br><br> iii. Any weapon, device or substance delivered by an airborne weapon delivery system including, but not limited to, fixed wing aircraft, helicopter or drone. |
| **You/Your** | The Named Insured whose details are shown in the **declarations**. |

# Coverage Part 1 – Property Damage

**I.      INSURING CLAUSE**

Under this Coverage Part of the Endorsement **we** will indemnify **you** against physical loss or physical damage to **insured property** caused by a **deadly weapon event**.  In the event that fire or sprinkler leakage ensues from a **deadly weapon event**, then this Coverage Part will also include physical loss or physical damage to **insured property** directly caused by that ensuing fire or sprinkler leakage.

WATFORD000034

ER DWP 03 19

## II.　　COVERAGE

In the event of a **deadly weapon event** that occurs during the **period of insurance** at any of **your location(s)**, and in conjunction with the recommendations of the **crisis management response team**, **we** shall be liable for:

1.　　The cost to repair, replace or reinstate, with new materials of like kind and quality, any physical loss or physical damage to the **insured property,** caused by such **deadly weapon event**.  Until replacement has been effected the amount of liability under this Coverage Part shall be limited to the **actual cash value** at the time of such **deadly weapon event**.

2.　　The costs **you** have incurred to put up temporary plates or board up openings if repair or replacement of damaged **glass** is delayed;

3.　　The costs **you** have incurred in the removal from the **location(s)** of debris of the **property insured** damaged as a result of a **deadly weapon event,** and in the clean-up of the **location(s),** including biological cleaning and sanitizing, in consequence of a **deadly weapon event**;

4.　　The costs **you** have incurred in re-filling, recharging or replacing any fire extinguishers, local or fixed fire suppression or gas flooding systems, sprinkler installations and sprinkler heads, and in having any fire or intruder alarms, or closed circuit television equipment re-set, made necessary as a result of a **deadly weapon event**;

5.　　The costs **you** have incurred in replacing locks to external doors if security at the **location(s)** is compromised in consequence of a **deadly weapon event**.

## III.　　EXCLUDED PROPERTY

This Coverage Part does not insure physical loss or physical damage to:

A.　　Land or land values;

B.　　Aircraft, watercraft or any vehicle that is licensed for highway use;

C.　　Animals;

D.　　Money, currency, checks, coins, stamps, securities, valuable papers, evidences of debt, precious stones, precious metals (unless forming an integral part of **insured property**), jewelry, furs, **fine arts and antiques**;

E.　　**Electronic data**;

F.　　Any property in transit not at the **location(s)**.

## IV.　　CONDITIONS (Applicable to this Coverage Part)

1.　　**Abandonment**

There shall be no abandonment to **us** of any property.

WATFORD000035

2.      **Salvage and Recoveries**

All salvage, recoveries and payments due to **you** will be applied as if recovered or received prior to settlement of the loss and all necessary adjustments will be made by the parties involved.

**V.      EXCLUSIONS (Applicable to this Coverage Part)**

This Endorsement does not cover any loss, damage, cost, claim or expense arising from, caused by, or in connection with:

A.      The enforcement of any ordinance or law regulating the use, reconstruction, repair or demolition of any property at the **location(s)**;

B.      Normal wear and tear, gradual deterioration, vermin or insects.

**VI.      DEFINITIONS (Applicable to this Coverage Part)**

1.      **Actual cash value** means the cost to repair, replace or reinstate the **insured property** with proper deduction to reflect any depreciation, deterioration and obsolescence of the **insured property**.

2.      **Electronic data** means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programs and software and other coded instructions for the processing and manipulation of **electronic data** or the direction and manipulation of electronic data processing equipment.

3.      **Fine arts and antiques** mean any articles of recognised artistic or collectible nature of whatsoever description including, but not limited to, tapestries, rugs, furniture, paintings, photographs, etchings, manuscripts, sculptures, statuary, porcelains, rare or art glass, objets d'art, contemporary art, clocks, articles of historical value or forming part of a collection.

4.      **Glass** means plain plate glass, plain sheet glass, laminated glass, and polycarbonate sheeting fixed into, or forming part of, any window, door, transom, fanlight, skylight, roof light, greenhouse or conservatory.

5.      **Insured property** means:

A.      Buildings, structures or detached outbuildings situated at the **location(s)**, including:

a.      Completed additions;

b.      Permanently installed machinery, equipment, and heating boilers;

c.      Permanently installed appliances used for refrigeration, ventilation, cooking, dishwashing or laundering;

d.      Floor coverings;

e.      **Glass**, wall mirrors, and **sanitary ware**.

WATFORD000036

ER DWP 03 19

B. Business personal property owned by **you,** which is of a type not excluded, whilst situated at the **location(s)**, including:

    a. Furniture and fixtures;

    b. Machinery and equipment not included in 5.A.b. above, electronic data processing equipment and computers; electronic data processing media;

    c. Appliances used for refrigeration, ventilation, cooking, dishwashing or laundering not included in 5.A.c. above;

    d. **Stock** and tools of the trade.

C. Personal property of others which is in **your** care, custody and control and personal property of others which **you** are responsible to insure, which is of a type not excluded, whilst situated at the **location(s)**.

D. At **your** option, personal property of **insured person(s)**, which is of a type not excluded, whilst situated at the **location(s)**.

6. **Sanitary ware** means baths, sinks, lavatory bowls and cisterns, washbasins and pedestals.

7. **Stock** means merchandise held for storage or for sale, raw materials, and in-process or finished goods, including supplies used in their packing or shipping.

# Coverage Part 2 – Business Interruption

**I. INSURING CLAUSE**

Under this Coverage Part of the Endorsement **we** will indemnify **you** against loss resulting from necessary interruption of **your business services** caused by a **deadly weapon event**.

**II. COVERAGE**

In the event of a **deadly weapon event** that occurs during the **period of insurance** at any of **your location(s)**, **we** shall be liable for the actual loss sustained by **you** resulting directly from such necessary interruption of **business services**, but not exceeding the reduction in **gross earnings** during the **period of indemnity**.

Due consideration shall be given to the continuation of **normal** charges and expenses, including payroll expenses, to the extent necessary to resume **your business services** at the same or equivalent operational capability that existed immediately prior to an **deadly weapon event**.

**III. CONDITION (Applicable to this Coverage Part)**

**Resumption of Operations**

**You** must take all reasonable steps to resume **business services** at the same or equivalent operational capability that existed prior to the **deadly weapon event** causing an insured interruption of **business services**.

WATFORD000037

ER DWP 03 19

**IV.     EXCLUSIONS (Applicable to this Coverage Part)**

This Coverage Part does not insure against:

A.      Increase in loss caused by the suspension, lapse, or cancellation of any lease, licence, contract, or order, unless such loss results directly from the insured interruption of **business services**, and then **we** shall be liable for only such loss as affects **your** earnings during, and limited to, the **period of indemnity** covered under this Coverage Part;

B.      Increase in loss caused by the enforcement of any ordinance or law regulating the use, reconstruction, repair or demolition of any property at the **location(s)**;

C.      Any costs, expenses or fees more specifically insured under any other Coverage Part of this Endorsement.

**V.      DEFINITIONS (Applicable to this Coverage Part)**

1.      **Gross earnings** mean:

    a.      The total earnings derived from **your business services** which **you** would have earned during the **period of indemnity** had there not have been a **deadly weapon event**.

    b.      The reasonable and necessary costs and expenses that **you** incur in using any property or service owned or controlled by **you**, or obtainable from any other sources, all whether at **your location(s)** or at any other location, during the **period of indemnity**, due to a **deadly weapon event** occurring during the **period of insurance**.

    c.      The increase in **gross earnings** loss described in 1.a. and 1.b. above which arises from increased time to rebuild, repair or reinstate the property at **your location(s)** due to the operation of the minimum requirements of any laws, statutes, or ordinances regulating public safety, security, emergency preparedness, or disaster management which are imposed upon **you** by order of any competent municipal, civil or governmental authority in connection with a **deadly weapon event** occurring during the **period of insurance**.

Less any charges and expenses which do not necessarily continue during the period of interruption of business.

In determining the amount of **gross earnings**, costs and expenses insured hereunder, for the purpose ascertaining the amount of **your** actual loss sustained, due consideration shall be given to the experience of **your business services** prior to the date of the **deadly weapon event** and the probable experience thereafter had no **deadly weapon event** occurred.

Except to the extent excluded by this Coverage Part, no other costs shall be deducted in determining **gross earnings**.

2.      **Normal** means the condition that would have existed but for the happening of a **deadly weapon event**.

3.      **Period of indemnity** means a period of time not to exceed the lesser of:

    a.      the length of time as would be required, with the exercise of due diligence and dispatch, to enable **you** to resume **business services** at the same or equivalent operational capability that existed immediately prior to the **deadly weapon event**

    or

WATFORD000038

ER DWP 03 19

     b.      three hundred and sixty-five (365) days

commencing with the date of such **deadly weapon event**, and not limited by the expiration of this insurance.

Such length of time described in 3.a and 3.b above shall include the time required with due diligence and dispatch to reinstate, rebuild, or replace **your** buildings, equipment and business personal property at another site if required to do so by order of a competent municipal, civil or governmental authority and as a direct result of a **deadly weapon event**.

## VI.    EXTENSION

This Coverage Part is extended to include any such loss as insured by this Coverage Part which **you** sustain as a direct result of the necessary interruption of **your business services** due to prevention of access to any **location(s)** by order of a civil or military authority, provided that such order is a sole and direct result of a **deadly weapon event** occurring at such **location** and for a period of time not exceeding thirty (30) consecutive days from the date of such **deadly weapon event**.

# Coverage Part 3 – Extra Expense

## I.    INSURING CLAUSE

Under this Coverage Part of the Endorsement **we** will indemnify **you** for **extra expense** incurred by **you** following a **deadly weapon event**.

## II.    COVERAGE

In the event of a **deadly weapon event** that occurs during the **period of insurance** at any of **your location(s)**, **we** shall be liable for the reasonable and necessary **extra expense** incurred by **you** in order to continue as nearly as practicable the **normal** conduct of **your business services** following a **deadly weapon event**.

## III.    CONDITIONS (Applicable to this Coverage Part)

1.    **Salvage**

At the end of the **period of restoration**, any salvage value remaining in property obtained for temporary use shall be taken into consideration in the determination of the amount of **extra expense** insured by this Coverage Part.

2.    **Resumption of Operations**

**You** must take all reasonable steps to resume **business services** at the same or equivalent operational capability that existed prior to the **deadly weapon event** causing **extra expense** to be incurred.

## IV.    EXCLUSIONS (Applicable to this Coverage Part)

This Coverage Part does not insure against:

A.    Increase in **extra expense** caused by the suspension, lapse, or cancellation of any lease, licence, contract, or order;

B.    Increase in **extra expense** caused by the enforcement of any ordinance or law regulating the use, reconstruction, repair or demolition of any property at the **location(s)**;

WATFORD000039

C.      Any costs, expenses or fees more specifically insured under any other Coverage Part of this Endorsement.

**V.      DEFINITIONS (Applicable to this Coverage Part)**

1.      **Extra expense** means the additional costs (if any) incurred by **you** during the **period of restoration** in order for **you** to operate as **normal**.

    **Extra expense** includes the reasonable cost incurred in obtaining property (buildings, equipment and other business personal property) for temporary use or occupation during the **period of restoration** necessarily required for the conduct of **your business services**, however, the amount recoverable under this Coverage Part for any such costs will not exceed the amount that would have been expended by **you** in renting, leasing or otherwise acquiring any such property of substantially similar size, capacity and quality as the property made unusable by the **deadly weapon event**.

2.      **Normal** means the condition that would have existed but for the happening of a **deadly weapon event**.

3.      **Period of restoration** means a period of time not to exceed the lesser of:

    a.      the length of time as would be required, with the exercise of due diligence and dispatch, to enable **you** to resume **business services** at the same or equivalent operational capability that existed immediately prior to a **deadly weapon event**

    or

    b.      three hundred and sixty-five (365) days

    commencing with the date of such **deadly weapon event**, and not limited by the expiration of this insurance but at all times in accordance with Condition 2 of this Coverage Part.

    Such length of time described in 3.a and 3.b above shall include the time required with due diligence and dispatch to reinstate, rebuild, or replace **your** buildings, equipment and business personal property at another site if required to do so by order of a competent municipal, civil or governmental authority and as a direct result of a **deadly weapon event**.

**VI.      EXTENSION**

    This Coverage Part is extended to include any such **extra expense** as insured by this Coverage Part which **you** incur as a direct result of the necessary interruption of **your business services** due to prevention of access to any **location(s)** by order of a civil or military authority, provided that such order is a sole and direct result of a **deadly weapon event** occurring at such **location** and for a period of time not exceeding thirty (30) consecutive days from the date of such **deadly weapon event**.

# Coverage Part 4 – Business Salary Expense

**I.      INSURING CLAUSE / COVERAGE**

Under this Coverage Part of the Endorsement **we** will indemnify **you** for reasonable and necessary **business salary expense** incurred by **you** following a **deadly weapon event** occurring during the **period of insurance** at any of **your location(s)**.

WATFORD000040

ER DWP 03 19

**II.    DEFINITIONS (Applicable to this Coverage Part)**

**Business salary expense** means the reasonable and necessary fees and expenses for, or the reasonable and necessary cost of:

1.    Salary or regular wages, for up to ninety (90) days following the date that the **deadly weapon event** is reported by **you** to a law enforcement authority, that **you** pay to employees affected by such **deadly weapon event** who are unable to continue to work because of such **deadly weapon event**. The salary or regular wages in effect at the time of such **deadly weapon event** shall apply; and

2.    Salary or regular wages, for up to ninety (90) days following the date that the **deadly weapon event** is reported by **you** to a law enforcement authority, that **you** pay to newly hired persons to conduct the duties of employees affected by such **deadly weapon event** and who are unable to continue to work because of such **deadly weapon event**; however such salary or regular wage shall not exceed the salary or regular wage of the affected employees in effect at the time of the **deadly weapon event**,

provided that **business salary expense** shall not include overtime wages, fees or benefit expenses associated with new hired persons or employees or any of **your** overhead expenses.

# Coverage Part 5 – Crisis Management Services

**I.    INSURING CLAUSE / COVERAGE**

Under this Coverage Part of the Endorsement **we** will pay on **your** behalf for the reasonable and necessary expense, in connection with a **deadly weapon event**, incurred in the provision of **crisis management services** to **you** directly after a **deadly weapon event** and for up to ninety (90) days after the **deadly weapon event**.   Such services available to **you** include, but are not limited to: emergency travel and accommodation for **insured person(s)** and their **immediate family members,** child care for the **immediate family members** of **insured person(s)**, brand rehabilitation, public relations, media management, legal, crisis counselling to **you**, site security, remediation and recovery, restoration and similar services.

**II.    DEFINITION (Applicable to this Coverage Part)**

**Crisis management services** mean the following services:

A.    Retention of Services

**You** will have access to the **crisis management response team** in the event of a **deadly weapon event.** To access this support on a 24-hour basis, **you** will call the **crisis management response team**. The **event responder** will work with their **crisis management response team** to determine the reasonable and appropriate response and will advise **you** accordingly.

B.    Crisis Response

The **event responder** will deploy U.S. based resources to support **you** in the event of a **deadly weapon event.** These **crisis management services** fall into the following three categories:

WATFORD000041

ER DWP 03 19

a.   Investigation

The **event responder** will (if required) conduct an independent investigation into the **deadly weapon event** for **your** sole use in determining the facts of the **deadly weapon event**, informing crisis response plans and identifying any potential third party liability exposures as soon as possible.

b.   Crisis Management Support

The **event responder** will provide advice and support to **you** on the management of the situation and the applicable crisis communication strategies post the **deadly weapon event**.

c.   Temporary Security Measures

The **event responder** will (if required) arrange for armed or unarmed agents to provide temporary security enhancements as required by the response strategies.

The **event responder** is the sole provider of such **crisis management services** under this Coverage Part.

# Coverage Part 6 – Counselling Services

**I.     INSURING CLAUSE / COVERAGE**

Under this Coverage Part of the Endorsement **we** will pay on **your** behalf for reasonable and necessary expense incurred by **you** in the provision of **counselling services** to **insured person(s)** and to their **immediate family members** in connection with a **deadly weapon event** that occurs during the **period of insurance** at any of **your location(s)**.

***Important Notice:***

*The insurance provided by this Coverage Part will not, however, apply to the extent that the provision of such coverage is prohibited by any law or statute of any applicable jurisdiction.*

**II.     SUBLIMIT OF LIABILITY (Applicable to this Coverage Part)**

**We** shall not be liable under this Coverage Part for more than USD 25,000 in respect of each and every **loss occurrence** of a **deadly weapon event**.  This Sublimit of Liability is a part of, and not in addition to, this Endorsement's overall Limit of Liability for each **loss occurrence** and, furthermore, is also a part of, and not in addition to, the **aggregate** Limit of Liability of this Endorsement.

**III.     DEFINITION (Applicable to this Coverage Part)**

**Counselling Services** means the utilisation of psychiatrists, social workers and counsellors following a **deadly weapon event**.  The **event responder** is the sole provider of such **counselling services** under this Coverage Part and will arrange the respective **counselling services** in conjunction with **you**.

WATFORD000042

ER DWP 03 19

# Coverage Part 7 – Funeral Expenses

**I.     INSURING CLAUSE / COVERAGE**

Under this Coverage Part of the Endorsement **we** will pay on **your** behalf for reasonable and necessary **funeral expenses** incurred by **you** in connection with a **deadly weapon event** that occurs during the **period of insurance** at any of **your location(s)**.

**II.     SUBLIMIT OF LIABILITY (Applicable to this Coverage Part)**

**We** shall not be liable under this Coverage Part for more than USD 25,000 in respect of each and every **loss occurrence** of a **deadly weapon event**.  This Sublimit of Liability is a part of, and not in addition to, this Endorsement's overall Limit of Liability for each **loss occurrence** and, furthermore, is also a part of, and not in addition to, the **aggregate** Limit of Liability of this Endorsement.

**III.     DEFINITION (Applicable to this Coverage Part)**

**Funeral expenses** means the professional services that are provided and charged via a fixed fee in order to cover the full arrangement of a funeral(s) for any **insured person(s)**. This includes:

a.     Personal supervision of all the arrangements preceding, during and following the service, liaison with third parties, such as clergy, crematorium, cemetery and florists, use of the funeral home facilities, such as chapels and private rooms, preparing and attending to all essential documentation and provision of all necessary funeral staff to provide a dignified and personal service.

b.     Supplementary charges, which include bringing the deceased into the undertakers care, presentation of the deceased, provision of a hearse and repatriation of mortal remains.

c.     The cost of the coffin or casket.

d.     Additional charges such as limousines, additional mileage and cremation casket.

e.     Disbursements and other out-of-pocket expenses which are reasonably and necessarily incurred by **you**, or on **your** behalf, in connection with any of the foregoing.

The **event responder** is the sole provider of such professional services under this Coverage Part and will arrange the respective funeral provisions in conjunction with **you**.

# General Exclusions (Applicable to All Coverage Parts)

These General Exclusions are applicable to **your** Endorsement including all of its Coverage Parts.

This Endorsement does not cover any loss, damage, cost, claim or expense arising from, caused by, or in connection with:

1.     Loss of market, loss of use, or any **consequential loss**.

2.     Confiscation, nationalization, requisition or destruction of or damage to property by or under the order of any government or public or local authority.

3.     Criminal, dishonest, fraudulent or malicious conduct committed by **you**.

WATFORD000043

ER DWP 03 19

4. Any explosive devices unless used in conjunction with a **deadly weapon event**.

5. a. Any vehicle not defined as a **road vehicle**;

   b. Any weapon mounted (or designed to be mounted) on a vehicle;

   c. Any weapon, device or substance delivered by an airborne weapon delivery system including, but not limited to, fixed wing aircraft, helicopter or drone.

6. The use or operation, as a means for inflicting harm, of any computer, computer system, computer software programme, malicious code, computer virus or process or any other electronic system.

7. a. Ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;

   b. The radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;

   c. Any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

   d. The radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter;

   e. Any chemical, biological, bio-chemical, or electromagnetic weapon.  This exclusion does not, however, apply to a substance when used in conjunction with a **deadly weapon event**.

8. **Your** recklessness or deliberate misconduct.

9. Any **pollutant or contaminant** however such **pollutant or contaminant** may have been introduced or arisen.  This exclusion does not, however, apply to a substance when used in conjunction with a **deadly weapon event** but in no event will this Endorsement insure against any loss, cost or expense of, or in connection with, decontamination or removal from any water, soil, or air of any **pollutant or contaminant**.

10. Strikes, labor unrest, riots or civil commotion.

11. War, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection; civil commotion assuming the proportions of, or amounting to, an uprising; military or usurped power.

WATFORD000044

# CYBER LIABILITY ENDORSEMENT

**IMPORTANT NOTICE**

In consideration of the premium charged and notwithstanding anything contained in the Policy to the contrary, it is understood and agreed that the Policy to which this Endorsement attaches is amended to include Cyber Liability insurance. Coverages A-D provide claims-made and reported coverage. Coverages E-H provide first party coverage on an event-discovered and reported basis.

The Cyber Liability limits of insurance are specified in the **CYBER LIABILITY DECLARATIONS** shown below. Such limits of insurance are in addition to, and will not erode, the limits of insurance provided elsewhere in the Policy. "Defense costs" paid under this Endorsement will reduce, and may completely exhaust, the Cyber Liability limits of insurance.

The terms, conditions, exclusions, and limits of insurance set forth in this Endorsement apply only to Cyber Liability insurance. Read the entire Endorsement carefully to determine "your" rights and duties and what is and is not covered.

Throughout this Endorsement, the words "we," "us," and "our" refer to the Company providing this insurance. Other words and phrases that appear in bold face type have special meaning as described in **SECTION IV – CYBER LIABILITY DEFINITIONS** of this Endorsement. To the extent any words or phrases used in this Endorsement are also defined elsewhere in the Policy, such definitions do not apply to the words or phrases used in this Endorsement.

# CYBER LIABILITY DECLARATIONS

Item 1.　　**Limits of Liability per Coverage**:

|  |  |  |
|---|---|---|
| A. | Multimedia Liability | $100,000.00 per "claim" and in the aggregate |
| B. | Security and Privacy Liability: | $100,000.00 per "claim" and in the aggregate |
| C. | Privacy Regulatory Defense and Penalties: | $100,000.00 per "claim" and in the aggregate |
| D. | PCI DSS Liability: | $100,000.00 per "claim" and in the aggregate |
| E. | Breach Event Costs: | $100,000.00 per "claim" and in the aggregate |
|  | Proactive Privacy Breach Response Costs Sublimit: | $100,000.00 per "claim" and in the aggregate |
|  | Voluntary Notification Expenses Sublimit: | $100,000.00 per "claim" and in the aggregate |
| F. | BrandGuard®: | $100,000.00 per "claim" and in the aggregate |
| G. | Network Asset Protection: | $100,000.00 per "claim" and in the aggregate |
| H. | Cyber Extortion: | $100,000.00 per "claim" and in the aggregate |

Item 2.　**Maximum Aggregate Limit of Liability**:　　$100,000.00

Item 3.　**Endorsement Period:**　　12-12-2019　　to　12-12-2020

Item 4.　**Retroactive Date**:　　12-12-2019

WATFORD000045

## CYBER LIABILITY TERMS AND CONDITIONS

### SECTION I - CYBER LIABILITY COVERAGES

The Company agrees with the "Named Insured" to provide coverage as follows:

### COVERAGE A. MULTIMEDIA LIABILITY

The Company will pay on behalf of an "Insured" the sums within the applicable Limits of Liability that such "Insured" becomes legally obligated to pay as "damages", including liability "assumed under contract", and related "defense costs" resulting from a "claim" for an actual or alleged "multimedia wrongful act", but only if: 1) the "claim" is first made against the "Insured" during the "endorsement period", 2) the "claim" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement, and 3) the "multimedia wrongful act" takes place on or after the "retroactive date".

### COVERAGE B. SECURITY AND PRIVACY LIABILITY

The Company will pay on behalf of an "Insured" the sums within the applicable Limits of Liability that such "Insured" becomes legally obligated to pay as "damages", including liability "assumed under contract", and related "defense costs" resulting from a "claim" for an actual or alleged "security and privacy wrongful act", but only if: 1) the "claim" is first made against the "Insured" during the "endorsement period", 2) the "claim" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement, and 3) the "security and privacy wrongful act" takes place on or after the "retroactive date".

### COVERAGE C. PRIVACY REGULATORY DEFENSE AND PENALTIES

The Company will pay on behalf of an "Insured" the sums within the applicable Limits of Liability that such "Insured" becomes legally obligated to pay as a "regulatory compensatory award" or "regulatory fines and penalties" (to the extent insurable by law) and related "defense costs" resulting from a "privacy regulatory proceeding" instituted against the "Insured" because of a "security breach" or "privacy breach", but only if: 1) the "privacy regulatory proceeding" is instituted against the "Insured" during the "endorsement period", 2) the "privacy regulatory proceeding" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement, and 3) the "security breach" or "privacy breach" occurs on or after the "retroactive date".

### COVERAGE D. PCI DSS LIABILITY

The Company will pay on behalf of an "Insured" the sums within the applicable Limits of Liability that such "Insured" becomes legally obligated to pay as "PCI DSS fines and assessments" and related "defense costs" because of a "claim" resulting from a "security breach" or "privacy breach", but only if: 1) the "claim" is first made against the "Insured" during the "endorsement period", 2) the "claim" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement, and 3) the "security breach" or "privacy breach" takes place on or after the "retroactive date".

### COVERAGE E. BREACH EVENT COSTS

Subject to the Limits of Liability, the Company will pay on "your" behalf the "privacy breach response costs", "notification expenses", and "breach support and credit monitoring expenses" that "you" incur because of an "adverse media report", "security breach" or "privacy breach", but only if: 1) the "adverse media report", "security breach" or "privacy breach" occurs on or after the "retroactive date", 2) the "adverse media report", "security breach" or "privacy breach" is first discovered by "you" or "your" "executive" during the "endorsement period", and 3) the "adverse media report", "security breach" or "privacy breach" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement.

WATFORD000046

**COVERAGE F. BRANDGUARD®**

Subject to the "waiting period" and Limits of Liability, the Company will indemnify "you" for provable and ascertainable "brand loss" that "you" sustain during the "period of indemnity" as a direct result of an "adverse media report" or "notification", but only if: 1) the "adverse media report" is first discovered by "you" or "your" "executive", or the "notification" first occurs, during the "endorsement period", 2) the "adverse media report" or "notification" results from a "security breach" or "privacy breach" that occurs on or after the "retroactive date", 3) the "brand loss" is reported to the Company in writing during the "period of indemnity", and 4) "you" provide clear evidence that the "brand loss" is directly attributable to the "adverse media report" or "notification".

**COVERAGE G. NETWORK ASSET PROTECTION**

**1. Data Recovery**

Subject to the Limits of Liability, the Company will indemnify "you" for "digital assets loss" and "special expenses" that "you" incur because of damage, alteration, corruption, distortion, theft, misuse, or destruction of "digital assets" which results from a "covered cause of loss", but only if: 1) the "covered cause of loss" occurs on or after the "retroactive date";  2) the "covered cause of loss" is first discovered by "you" or "your" "executive" during the "endorsement period", and 3) the "covered cause of loss" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement.

"Digital assets loss" and "special expenses" will be reimbursed for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse, or destruction of "digital assets".

**2. Non-Physical Business Interruption and Extra Expense**

Subject to the "waiting period" and Limits of Liability, the Company will indemnify "you" for "income loss", "interruption expenses", and "special expenses" that "you" incur during the "period of restoration" because of a total or partial interruption, degradation in service, or failure of an "insured computer system" which results from a "covered cause of loss", but only if: 1) the "covered cause of loss" occurs on or after the "retroactive date"; 2) the "covered cause of loss" is first discovered by "you" or "your" "executive" during the "endorsement period", and 3) the "covered cause of loss" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement.

**COVERAGE H. CYBER EXTORTION**

Subject to the Limits of Liability, the Company will indemnify "you" for "cyber extortion expenses" and "cyber extortion monies" that "you" pay as a direct result of a "cyber extortion threat", but only if: 1) the "cyber extortion threat" is made against "you" during the "endorsement period", and 2) the "cyber extortion threat" is reported to the Company in writing in accordance with **SECTION V – NOTICE PROVISIONS** of this Endorsement.

The Company will not be obligated to pay "cyber extortion expenses" or "cyber extortion monies" unless the Company has given prior written consent for the payment of "cyber extortion monies" in response to a "cyber extortion threat". The "Insured" must make every reasonable effort to notify local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any "cyber extortion monies" in response to a "cyber extortion threat".

**SECTION II. CYBER LIABILITY DEFENSE AND SETTLEMENT PROVISIONS**

The following defense and settlement provisions will apply only to the coverage provided under this Endorsement and will supersede any other defense and settlement provisions contained elsewhere in the Policy.

WATFORD000047

1. We have the right and duty to defend an "Insured" against any "claim" covered under Coverage A, Coverage B, Coverage C, or Coverage D, even if the allegations are groundless, false or fraudulent. We have the right to appoint an attorney to defend any such "claim". However, the Company will have no duty to defend any "Insured" against any "claim" seeking amounts or relief to which this insurance does not apply.

2. The Limits of Liability available to pay "damages" will be reduced, and may be completely exhausted, by payment of "defense costs" or any other amounts covered under this Endorsement.

3. The "Insured" shall not pay any "damages", "defense costs", or other amounts covered under this Endorsement, or settle or offer to settle any "claim", assume any contractual obligation, admit liability, voluntarily make any payment, or confess or otherwise consent to any "damages" or judgments without our prior written consent, which consent will not be unreasonably withheld. We will not be liable for any "damages", "defense costs", settlement, judgment, assumed obligation, admitted liability, voluntary payment or confessed "damages" to which we have not consented.

4. We have the right to make any investigation we deem necessary, including, without limitation, any investigation with respect to coverage.

5. With respect to Coverage A, Coverage B, Coverage C, and Coverage D only, we will not settle any "claim" or pay any "damages", "regulatory compensatory award", "regulatory fines and penalties", or "PCI DSS fines and assessments", whichever applies, without the "Insured's" consent. If an "Insured" refuses to consent to any settlement or compromise recommended by us or our representatives that is acceptable to the claimant, and the "Insured" elects to contest the "claim" or continue any legal proceedings in connection with such "claim", then our liability for "damages", "defense costs", "regulatory compensatory award", "regulatory fines and penalties", or "PCI DSS fines and assessments", whichever applies, will not exceed the following amount, subject to the Limits of Liability:

   a. The amount for which the "claim" could have been settled and "defense costs" incurred as of the date the "Insured" withheld consent to such settlement, plus

   b. Fifty percent (50%) of any "damages", "defense costs", "regulatory compensatory award", "regulatory fines and penalties" or "PCI DSS fines and assessments" incurred after the date the "Insured" withheld consent to such settlement or compromise. The remaining fifty percent (50%) of such "damages", "defense costs", "regulatory compensatory award", "regulatory fines and penalties", or "PCI DSS fines and assessments", whichever applies, and any amounts that exceed the applicable Limit of Liability, will be borne by the "Insured" at the "Insured's" own risk and will be uninsured under this Endorsement.

6. We have no duty to pay any "damages", "defense costs", or other amounts covered under this Endorsement, or to undertake or continue the defense of any "claim", after the Limit of Liability is exhausted. Once the Limit of Liability is exhausted, the Company has the right to withdraw from the further defense or payment of any "claim" by transferring control of said "claim" to the "Insured" in accordance with **SECTION X – TRANSFER OF DUTIES WHEN THE LIMITS OF INSURANCE ARE EXHAUSTED** of this Endorsement.

## SECTION III – CYBER LIABILITY LIMITS OF LIABILITY

1. The Limits of Liability set forth in Item 1 of the **CYBER LIABILITY DECLARATIONS** represent the most we will pay under each Coverage for each "claim" first made during the "endorsement period" and in the aggregate for all "claims" first made during the "endorsement period", including "defense costs" where applicable, regardless of the number of "claim", claimants or "Insureds". If the Limit of

WATFORD000048

Liability for any Coverage is exhausted, our obligations under that Coverage will be deemed completely fulfilled and extinguished.

**2.**     The Maximum Aggregate Limit of Liability set forth in Item 2 of the **CYBER LIABILITY DECLARATIONS** is the most we will pay under this Endorsement for all "claims" first made during the "endorsement period", including "defense costs" where applicable, regardless of the number of "claims", claimants or "Insureds", or the number of Coverages that apply. All amounts we pay under this Endorsement will reduce, and may completely exhaust, the Maximum Aggregate Limit of Liability.

**3.**     All "claims" which arise out of the same, related, or continuing incidents, acts, facts or circumstances will be considered a single "claim", regardless of the number of "claims" made, "Insureds" affected, or claimants involved.  Only one Limit of Liability will apply to such "claim".  All "claims" which arise out of the same, related, or continuing incidents, acts, facts or circumstances will be deemed first made on the date the earliest of such "claims" is first made and will be deemed first reported to us on the date the earliest of such "claim" is reported to us.

**4.**     If a "claim" is covered under more than one Coverage of this Endorsement, we will allocate payments to that portion of the "claim" covered under each applicable Coverage; provided, however, that a) we will never pay more under any one Coverage than the Limit of Liability shown in Item 1 of the **CYBER LIABILITY DECLARATIONS** for that Coverage; and b) our total aggregate Limit of Liability for such "claim" will not exceed the single largest Limit of Liability that applies.  The Company has the sole discretion to allocate "claims" paid, if any, against the appropriate Limit of Liability.

**5.**     The existence of a "cyber liability extended reporting period" will not increase or reinstate the Limits of Liability set forth in the **CYBER LIABILITY DECLARATIONS**.

## SECTION IV – CYBER LIABILITY DEFINITIONS

Certain words used in this Endorsement are shown in bold and are defined as follows.  If a term is defined below and in the Policy, the definition below applies only to the coverage provided by this Endorsement.

"Act of cyber terrorism" means the premeditated use of information technology to organize and execute attacks, or the threat thereof, against computers, "computer systems", networks or the "internet" by any person or group, whether acting alone or on behalf of, or in connection with, any organization or government, which is committed for political, religious, or ideological purposes, with the intention to influence any government, put the public in fear, or cause destruction or harm to critical infrastructure or "data".

"Acquiring bank" means a bank or financial institution that accepts credit or debit card payments (including stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

"Adverse media report" means a report or communication of an actual or potential "security breach" or "privacy breach" which has been publicized through any media channel, including, but not limited to, television, "print media", radio or electronic networks, the "internet", or electronic mail, and threatens material damage to "your reputation" or brand.

"Assumed under contract" means liability for "damages" resulting from a "multimedia wrongful act", "security breach", or "privacy breach", where such liability has been assumed by an "Insured" in the form of a written hold harmless or indemnity agreement, but only if such agreement was executed before the "multimedia wrongful act", "security breach" or "privacy breach" occurred.

"Bodily injury" means physical injury, sickness, disease, or death sustained by any person and, where resulting from such physical injury only, mental anguish, mental injury, shock, humiliation, or emotional distress.

WATFORD000049

"BPO service provider" means any independent contractor that provides business process outsourcing services for "your" benefit under a written contract with "you", including, but not limited to, call center services, fulfillment services, and logistical support.

"Brand loss" means "your" net profit, as could have reasonably been projected immediately prior to "notification", or in the event of an "adverse media report", immediately prior to the publication of an "adverse media report", but which has been lost during the "period of indemnity" as a direct result of such "adverse media report" or "notification". "Brand loss" will be determined in accordance with the provisions of **SECTION IX – LOSS DETERMINATION** of this Endorsement.

"Breach support and credit monitoring expenses" means those reasonable and necessary expenses that "you" incur on "your" own behalf, or on behalf of a party for whom "you" are "vicariously liable", to provide support activity to affected individuals in the event of a "privacy breach". "Breach support and credit monitoring expenses" includes the cost to set up a call center and to provide a maximum of 12 months of credit monitoring services, identity theft assistance services, or credit repair and restoration services. "Breach support and credit monitoring expenses" must be incurred with the Company's prior written consent.

"Card association" means Visa International, MasterCard, Discover, JCB, American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

"Claim" means:

1.  With respect to Coverage A and Coverage B only:
    a.  A written demand made against an "Insured" for "damages" or non-monetary relief;
    b.  A written request received by an "Insured" to toll or waive a statute of limitations relating to a potential "claim" against an "Insured"; or
    c.  The service of a civil lawsuit or the institution of arbitration or other alternative dispute resolution proceedings against an "Insured" seeking "damages", a temporary restraining order, or a preliminary or permanent injunction.
    A "claim" under Coverage A or Coverage B does not include a "PCI DSS demand".
2.  With respect to Coverage C only, a "privacy regulatory proceeding". A "claim" under Coverage C does not include a "PCI DSS demand".
3.  With respect to Coverage D only, a "PCI DSS demand".
4.  With respect to Coverage E only, "your" written notice to the Company of an "adverse media report", "security breach" or "privacy breach".
5.  With respect to Coverage F only, "your" written notice to the Company of an "adverse media report" or "notification" that has resulted or may result in "brand loss".
6.  With respect to Coverage G only, "your" written notice to the Company of a "covered cause of loss".
7.  With respect to Coverage H only, "your" written notice to the Company of a "cyber extortion threat".

A "claim" under Coverage A, Coverage B, Coverage C or Coverage D will be deemed to be first made when it is received by an "Insured". A "claim" under Coverage E, Coverage F, Coverage G, or Coverage H will be deemed to be first made when "your" written notice of the event or incident giving rise to the "claim" is received by the Company.

"Computer hardware" means the physical components of any "computer system", including CPUs, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cables, connectors, fiber optics, wires, power supply units, keyboards, display monitors and audio speakers.

"Computer program" means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. A "computer program" includes, but is not limited to, the communications,

WATFORD000050

networking, operating systems and related processes used to create, maintain, process, retrieve, store, or transmit "data".

"Computer system" means an interconnected electronic, wireless, web, or similar system (including all "computer hardware" and software) used to process and store "data" or information in an analogue, digital, electronic or wireless format, including, but not limited to, "computer programs", "data", operating systems, "firmware", servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off-line storage facilities (to the extent that they hold "data"), and electronic backup equipment.

"Computer virus" means a program that possesses the ability to create replicas of itself (commonly known as an "auto-reproduction" program) within other programs or operating system areas, or which can spread copies of itself wholly or partly to other "computer systems".

"Covered cause of loss" means and is limited to the following:

**1.** <u>Accidental Damage or Destruction</u>

    **a.** Accidental physical damage to, or destruction of, "electronic media" so that stored "digital assets" are no longer machine-readable;

    **b.** Accidental damage to, or destruction of, "computer hardware" so that stored "data" is no longer machine-readable;

    **c.** Failure in power supply or under/over voltage, but only if such power supply, including back-up generators, is under "your" direct operational control;

    **d.** "Programming error" of "delivered programs"; or

    **e.** Electrostatic build-up and static electricity.

**2.** <u>Administrative or Operational Mistakes</u>

An accidental, unintentional, or negligent act, error or omission by an "insured", a "BPO service provider" or an "outsourced IT service provider" in:

    **a.** The entry or modification of "data" on an "insured computer system", which causes damage to such "data";

    **b.** The creation, handling, development, modification, or maintenance of "digital assets"; or

    **c.** The ongoing operation or maintenance of an "insured computer system", excluding the design, architecture, or configuration of an "insured computer system".

**3.** <u>Computer Crime and Computer Attacks</u>

An unintentional or negligent act, error or omission by an "insured", a "BPO service provider", or an "outsourced IT service provider" in the operation of an "insured computer system" or in the handling of "digital assets", which fails to prevent or hinder any of the following attacks on an "insured computer system":

    **a.** A "denial of service attack";

    **b.** "Malicious code";

    **c.** "Unauthorized access";

    **d.** "Unauthorized use"; or

    **e.** An "act of cyber terrorism".

"Cyber extortion expenses" means all reasonable and necessary costs and expenses, other than "cyber extortion monies", that "you" incur with the Company's prior written consent as a direct result of a "cyber extortion threat".

WATFORD000051

"Cyber extortion monies" means any "money" or "other property" "you" pay, with the Company's prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a "cyber extortion threat", to terminate such "cyber extortion threat".

"Cyber extortion threat" means a credible threat or series of related credible threats, including a demand for "cyber extortion monies", which is directed at "you" to:

1.  Release, divulge, disseminate, destroy or use "private information" taken from an "Insured" as a result of "unauthorized access" to, or "unauthorized use" of, an "insured computer system";
2.  Introduce "malicious code" into an "insured computer system";
3.  Corrupt, damage or destroy an "insured computer system";
4.  Restrict or hinder access to an "insured computer system", including the threat of a "denial of service attack"; or
5.  Electronically communicate with "your" customers and falsely claim to be "you", or to be acting under "your" direction, to falsely obtain "private information" (also known as "pharming," "phishing," or other types of false communications).

A series of continuing "cyber extortion threats", related or repeated "cyber extortion threats", or multiple "cyber extortion threats" resulting from the same event or incident will be considered a single "cyber extortion threat" and will be deemed to have occurred at the time the first of such "cyber extortion threats" occurred.

"Cyber liability extended reporting period" means the period after the end of the "endorsement period" for reporting "claims", as provided in **SECTION VI – CYBER LIABILITY EXTENDED REPORTING PROVISIONS** and specifically excludes the "endorsement period".

"Damages" means a monetary judgment, award, or settlement, including prejudgment and post-judgment interest awarded against an "Insured" on that part of any judgment paid or to be paid by the Company; and punitive, exemplary or multiplied "damages" to the extent insurable under the law pursuant to which this Endorsement is construed.

With respect to the insurability of punitive, exemplary or multiplied "damages", the applicable law will be the law of the state most favorable to the "Insured", provided that the state whose law is most favorable to the "Insured" has a reasonable relationship to the "claim".

A state's law will be deemed to have a reasonable relationship to the "claim" if it is the state where:

1.  The "Named Insured" is incorporated or has a place of business;
2.  The "claim" is pending; or
3.  Any "multimedia wrongful act" or "security and privacy wrongful act" (whichever applies) was committed or allegedly committed by an "Insured".

"Damages" does not include:

1.  Any "Insured's" future profits or royalties, restitution, or disgorgement of any "Insured's" profits;
2.  The costs to comply with orders granting injunctive or non-monetary relief, including specific performance, or any agreement to provide such relief;
3.  Loss of any "Insured's" fees or profits, the return or offset of any "Insured's" fees or charges, or any "Insured's" commissions or royalties provided or contracted to be provided;
4.  Taxes, fines or penalties, or sanctions;
5.  Contractual liquidated "damages", to the extent such "damages" exceed the amount for which the "Insured" would have been liable in the absence of the liquidated "damages" agreement;
6.  Any amount which an "Insured" is not financially or legally obligated to pay;

WATFORD000052

7.  Disgorgement of any remuneration or financial advantage to which an "Insured" was not legally entitled;
8.  Settlements negotiated without the Company's consent;
9.  Monetary judgments, awards, settlements or any other amounts which are uninsurable under the law pursuant to which this Endorsement is construed or any legal fees and costs awarded pursuant to such judgments, awards or settlements; or
10. "PCI DSS fines and assessments".

"Data" means any machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, customer information, health and medical information, or other electronic information that is subject to back-up procedures, irrespective of the way it is used and rendered.

"Defense costs" means:

1.  Reasonable and necessary fees incurred with the Company's consent and charged by an attorney(s) designated by the Company to defend against a "claim" under Coverage A, Coverage B, Coverage C, or Coverage D; and
2.  All other reasonable and necessary fees, costs, and expenses resulting from the defense and appeal of a "claim" under Coverage A, Coverage B, Coverage C, or Coverage D, if incurred by the Company or by an "Insured" with our prior written consent.

"Defense costs" does not include any wages or salaries of an "Insured", or fees, overhead or other charges incurred by, or paid to, any "Insured" for any time spent in cooperating in the investigation or defense of a "claim" or a potential "claim".

"Delivered programs" means "computer programs" where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

"Denial of service attack" means an event caused by unauthorized or unexpected interference or a malicious attack, which is intended by the perpetrator to overwhelm the capacity of a "computer system" by sending an excessive volume of "data" to such "computer system" to prevent access to such "computer system".

"Digital assets" means "data" and "computer programs" that exist in an "insured computer system".  "Digital assets" do not include "computer hardware".

"Digital assets loss" means reasonable and necessary expenses and costs that "you" incur to replace, recreate or restore "digital assets" to the same state and with the same contents immediately before the "digital assets" were damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time.  "Digital assets loss" also includes amounts representing "employee" work time to replace, recreate or restore "digital assets", which will be determined on a predefined billable hour or per-hour basis as based upon "your" schedule of "employee" billable hours. "Digital assets loss" will be determined in accordance with the provisions of **SECTION IX – LOSS DETERMINATION** of this Endorsement. "Digital assets loss" does not include:

1.  The cost(s) of restoring, updating, or replacing "digital assets" to a level beyond that which existed prior to a "covered cause of loss";
2.  Physical damage to the "computer hardware" or "data" center other than accidental physical damage to, or destruction of, "electronic media" so that stored "digital assets" are no longer machine-readable;
3.  Contractual penalties or consequential damages;
4.  Any liability to "third parties" for whatever reason, including, but not limited to, legal costs and expenses of any type;
5.  Fines or penalties imposed by law;
6.  The economic or market value of "digital assets";

WATFORD000053

7.   Costs or expenses incurred to identify, patch, or remediate software program errors or "computer system" vulnerabilities;
8.   Costs to upgrade, redesign, reconfigure, or maintain an "insured computer system" to a level of functionality beyond that which existed prior to the "covered cause of loss";
9    Any loss paid or payable under Coverage G.2. of this Endorsement;
10.  The cost(s) of restoring, replacing or repairing "electronic media"; or
11.  Any loss arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake.

"Electronic media" means floppy disks, CD ROMs, hard drives, magnetic tapes, magnetic discs, or any other media on which "data" is recorded or stored.

"Employee" means any individual whose labor or service is engaged by and directed by "you", including volunteers and part-time, seasonal, temporary or leased workers. "Employee" does not include any "executive" or independent contractor.

"Endorsement period" means the period specified as such in Item 3 of the **CYBER LIABILITY DECLARATIONS**. Coverage may be canceled or otherwise terminated before the "endorsement period" expiration date.

"Executive" means any of "your" directors or officers, including "your" chief executive officer, chief financial officer, chief operations officer, chief technology officer, chief information officer, chief privacy officer, general counsel or other in-house lawyer, and risk manager.

"Firmware" means the fixed programs that internally control basic low-level operations in a device.

"First party insured event" means:

1.   With respect to Coverage E only, an "adverse media report", "security breach" or "privacy breach";
2.   With respect to Insuring Agreement F, a "security breach" or "privacy breach";
3.   With respect to Insuring Agreement G, a "covered cause of loss"; and
4.   With respect to Insuring Agreement H, a "cyber extortion threat".

"First party insured event" only pertains to loss sustained by "you" and does not include any "claim" made or brought against an "Insured".

"Income loss" means the net profit loss "you" sustain during the "period of restoration" as a direct result of a "covered cause of loss". "Income loss" will be determined in accordance with the provisions of **SECTION IX – LOSS DETERMINATION** of this Endorsement. "Income loss" does not include:

1.   Any loss arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake;
2.   Any loss or expense arising out of updating or replacing "digital assets" to a level beyond that which existed prior to the "covered cause of loss";
3.   Contractual penalties or consequential damages;
4.   Any liability to "third parties" for whatever reason, including, but not limited to, legal costs and expenses of any type;
5.   Fines or penalties imposed by law;
6.   Costs or expenses incurred to identify, patch, or remediate software program errors or "computer system" vulnerabilities;
7.   Loss of goodwill or reputational harm;
8.   Costs to upgrade, redesign, reconfigure, or maintain an "insured computer system" to a level of functionality beyond that which existed prior to the "covered cause of loss"; or
9.   Any losses paid or payable under Coverage G.1. of this Endorsement.

"Insured" means:

1. The "Named Insured";
2. Any "Subsidiary" of the "Named Insured", but only with respect to "wrongful acts" or "first party insured events" that occur while a "Subsidiary" is owned by the "Named Insured";
3. Any past, present, or future officer, director, trustee, or "employee" of the "Named Insured" or "Subsidiary", but only while acting solely within the scope of his or her duties as such;
4. If the "Named Insured" or "Subsidiary" is a partnership, limited liability partnership, or limited liability company, then any general or managing partner, principal, stockholder, or owner thereof, but only while acting solely within the scope of his or her duties as such;
5. Any agent or independent contractor of the "Named Insured" or "Subsidiary", but only while acting on behalf of, at the direction of, and under the supervision of the "Named Insured" or "Subsidiary"; and
6. Any person or legal entity the "Named Insured" is required by written contract to provide such coverage as is afforded by this Policy, but only for the acts of a party described in paragraph 1., 2. or 3. above, and only if the written contract is executed prior to the date any "wrongful act" or "first party insured event" occurs.

"Insured computer system" means a "computer system" operated by, and either owned by or leased to, "you". With respect to Coverage B only, "insured computer system" also includes a "computer system" operated by a "BPO service provider" or an "outsourced IT service provider", which is used to provide hosted computer application services to "you", or for processing, maintaining, hosting, or storing "data" for "you", pursuant to a written contract with "you" to provide such services. With respect to Coverage H only, "insured computer system" also includes a system operated by an organization providing computing resources to "you" that are delivered as a service over a network or the "internet" (commonly known as "cloud computing"), including Software as a Service, Platform as a Service and Infrastructure as a Service.

"Internet" means the worldwide public network of computers which enables the transmission of "data" between different users, including a private communications network existing within a shared or public network platform.

"Interruption expenses" means those reasonable and necessary expenses, excluding "special expenses", incurred by "you" to avoid or minimize the suspension of "your" business because of a total or partial interruption, degradation in service, or failure of an "insured computer system" caused by a "covered cause of loss", which "you" would not have incurred had no "covered cause of loss" occurred. "Interruption expenses" include, but are not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of "third party" services, or additional staff expenditures or labor costs. The amount of "interruption expenses" recoverable shall not exceed the amount by which the covered "income loss" is reduced by such incurred expenses. "Interruption expenses" does not include:

1. Any loss arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake;
2. Any loss expense arising out of updating or replacing "digital assets" to a level beyond that which existed prior to the "covered cause of loss";
3. Contractual penalties or consequential damages;
4. Any liability to "third parties" for whatever reason, including, but not limited to, legal costs and expenses of any type;
5. Fines or penalties imposed by law;
6. Costs or expenses incurred to identify, patch, or remediate software program errors or "computer system" vulnerabilities;
7. Loss of goodwill or reputational harm;
8. Costs to upgrade, redesign, reconfigure, or maintain an "insured computer system" to a level of functionality beyond that which existed prior to the "covered cause of loss"; or

WATFORD000055

**9.**     Any losses paid or payable under Coverage G.1. of this Endorsement.

"Malicious code" means software intentionally designed to insert itself by a variety of forms into a "computer system", without the owner's informed consent, and cause damage to the "computer system". "Malicious code" includes, but is not limited to, "computer viruses", worms, Trojan horses, spyware, dishonest adware, and crimeware.

"Media material" means communicative material of any kind or nature for which "you" are responsible, including, but not limited to, words, pictures, sounds, images, graphics, code and "data", regardless of the method or medium of communication of such material or the purpose for which the communication is intended.

"Media material" does not include any tangible goods or products that are manufactured, produced, processed, prepared, assembled, packaged, labeled, sold, handled or distributed by "you" or others trading under "your" name.

"Merchant services agreement" means an agreement between "you" and an "acquiring bank", "card association", brand, network, credit or debit card processor, independent sales organization, gateway, or membership service, which enables "you" to accept payment by credit card, debit card or prepaid card.

"Money" means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including, but not limited to, currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

"Multimedia wrongful act" means any of the following, whether actual or alleged, but only if directly resulting from the dissemination of "media material" by an "Insured":

**1.**     Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;
**2.**     Invasion, infringement or interference with an individual's right of privacy or publicity, including the torts of false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;
**3.**     Plagiarism, piracy or misappropriation of ideas under an implied contract;
**4.**     Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name;
**5.**     Domain name infringement or improper deep-linking or framing;
**6.**     Negligence in "media material", including a "claim" alleging harm to any person or entity that acted or failed to act in reliance upon such "media material";
**7.**     False arrest, detention or imprisonment;
**8.**     Trespass, wrongful entry or eviction, eavesdropping, or other invasion of the right of private occupancy; or
**9.**     Unfair competition, but only when arising out of a peril described in **1.** through **8.** above.

"Named insured" means the person or organization listed as such on the Policy Declarations Page to which this Endorsement attaches.

"Notification" means written notice to affected individuals in the event of a "security breach" or "privacy breach".

"Notification expenses" means those reasonable and necessary legal expenses, forensic and investigation expenses, postage expenses, and related advertising expenses that "you" incur on "your" own behalf, or on behalf of a party for who "you" are "vicariously liable", to comply with governmental privacy legislation mandating "notification" to affected individuals in the event of a "security breach" or "privacy breach".

WATFORD000056

"Notification expenses" must be incurred with the Company's prior written consent. "Notification expenses" also includes "voluntary notification expenses".

"Other property" means any tangible property, other than "money" or "securities", which has intrinsic value.

"Outsourced IT service provider" means an independent contractor that provides information technology services for "your" benefit, under a written contract with "you" to provide such services.  "Outsourced IT service provider" services include, but are not limited to, hosting, security management, co-location, and "data" storage.

"PCI Data Security Standard" (known as "PCI DSS") means the Payment Card Industry Security Standards Council Data Security Standard in effect now, or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder "data".

"PCI DSS demand" means a written demand for "PCI DSS fines and assessments" received by an "Insured" directly or indirectly from or through an "acquiring bank", "card association", or payment card processor due to the "Insured's" non-compliance with the "PCI Data Security Standard".

"PCI DSS fines and assessments" means monetary fines, penalties or assessments (including fraud recoveries, card reissuance costs, operational expenses, or compliance case costs) owed by an "Insured" under the terms of a "merchant services agreement", but only where such monetary fines, penalties or assessments result from a "security breach" or "privacy breach".

"Period of indemnity" means the period beginning on the earlier of the date of "notification" or the first "adverse media report" (whichever applies), and ending on the earlier of:

1. The date that gross revenues are restored to the level they had been prior to "notification" or the first "adverse media report" (whichever applies); or
2. One hundred eighty (180) consecutive days after the notice of "brand loss" is received by the Company.

"Period of restoration" means the period beginning on the date when the interruption, degradation in service, or failure of an "insured computer system" began, and ending on the earlier of:

1. The date when an "insured computer system" is restored or could have been repaired or restored with reasonable speed to the same condition, functionality and level of service that existed prior to the "covered cause of loss", plus a maximum of thirty (30) additional consecutive days after the restoration of an "insured computer system" to allow for restoration of "your" business; or
2. One hundred twenty (120) consecutive days after the notice of "covered cause of loss" is received by the Company.

"Personally identifiable information" means information that can be used to determine, distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual.

"Print media" means newspapers, newsletters, magazines, books and literary works in any form, brochures or other types of publications, and advertising materials including packaging, photographs, and digital images.

"Privacy breach" means any of the following:

1. The unauthorized collection, disclosure, use, access, destruction or modification of "private information";
2. The inability to access, or failure to provide, "private information";
3. Theft of "private information";

WATFORD000057

4.   The surrender of "private information" as a result of false communications or social engineering techniques, including but not limited to phishing, spear-phishing, and pharming;

5.   Failure to implement, maintain, or comply with privacy policies and procedures stating "your" obligations regarding "private information", including but not limited to "your privacy policy";

6.   Failure to develop or administer an identity theft prevention program;

7.   Failure to implement specific security practices with respect to "private information" required by any "privacy regulations";

8.   An infringement or violation of any rights to privacy;

9.   Breach of a person's right of publicity, false light, intrusion upon a person's seclusion;

10.  Failure to comply with "privacy regulations" pertaining to the "Insured's" responsibilities with respect to "private information", but only relating to an act listed in paragraphs **1.** through **8.** above; or

11.  Failure to comply with any federal, state, foreign or other law (including common law), statute or regulation prohibiting unfair or deceptive trade practices or consumer fraud pertaining to the "Insured's" responsibilities with respect to "private information", but only relating to an act listed in paragraphs **1.** through **8.** above.

A series of continuing "privacy breaches", related or repeated "privacy breaches", or multiple "privacy breaches" resulting from the same event or incident will be considered a single "privacy breach" and will be deemed to have occurred at the time the first of such "privacy breaches" occurred.

"Privacy breach response costs" means:

1.   Those reasonable and necessary "public relations expenses" that "you" incur, with the Company's prior written consent, for the employment of a public relations consultant, if such action is reasonably necessary to avert or mitigate any material damage to "your reputation" or brands, which results or reasonably could result from an "adverse media report"; and

2.   "Proactive privacy breach response costs" incurred with the Company's prior written consent, subject to the "proactive privacy breach response costs sublimit".

"Privacy regulations" means federal, state or local statutes, rules, regulations and other laws, as they currently exist and as amended, associated with the confidentiality, access, control, and use of "private information", including, but not limited to:

1.   Health Insurance Portability and Accountability Act of 1996 (Public Law 104- 191), known as HIPAA, and related or similar state medical privacy laws;

2.   Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999, including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder;

3.   State and Federal statutes and regulations regarding the security and privacy of consumer information;

4.   Governmental privacy protection regulations or laws associated with the control and use of personal information, including but not limited to requirements to post or publish "your privacy policy", adopt specific privacy controls, or inform customers of actual or suspected "privacy breaches";

5.   Privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;

6.   Children's Online Privacy Protection Act or similar laws, as they exist now or in the future;

7.   The EU Data Protection Act or other similar privacy and security statutes, rules, regulations or other laws worldwide, as they exist now or in the future; and

8.   The Health Information Technology for Economic and Clinical Health Act (HITECH ACT), enacted under Title XIII of the American Recovery and Reinvestment Act of 2009 (ARRA) (Pub. L. 111-5), and its implementing regulations, including related or similar state medical privacy laws.

"Privacy regulatory proceeding" means a formal civil administrative proceeding or regulatory action instituted against an "Insured" by a federal, state or local governmental body because of a "security breach" or "privacy breach".

WATFORD000058

"Private information" means:

1. Proprietary or confidential information owned by a "third party" that is in the care, custody or control of an "Insured" or is used by an "Insured" with the consent of such "third party";
2. "Personally identifiable information"; and
3. Any information that is linked or linkable to a specific individual and that is subject to any "privacy regulations".

"Proactive privacy breach response costs" means those reasonable and necessary "public relations expenses" that "you" incur in response to an actual or potential "security breach" or "privacy breach", but prior to the publication of an "adverse media report", to avert or mitigate the potential impact of an "adverse media report". "Proactive privacy breach response costs" must be incurred with the Company's prior written consent and are subject to the "proactive privacy breach response costs sublimit".

"Proactive privacy breach response costs sublimit" means the maximum amount that the Company will pay for "proactive privacy breach response costs". The "proactive privacy breach response costs sublimit" is included within, and will erode, the Limits of Liability for Coverage E of this Endorsement.

"Programming error" means an error which occurs during the development or encoding of a "computer program", software or application and which would, when in operation, result in a malfunction or incorrect operation of a "computer system".

"Property damage" means physical injury to, or impairment, destruction or corruption of, any tangible property, including the loss of use thereof. "Data" is not considered tangible property.

"Public relations expenses" means expenses that "you" incur to re-establish "your reputation", which was damaged as a direct result of an "adverse media report".

"Regulatory compensatory award" means a sum of "money" which an "Insured" is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a "third party", due to an adverse judgment or settlement arising out of a "privacy regulatory proceeding". "Regulatory compensatory award" does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

"Regulatory fines and penalties" means civil fines or penalties imposed by a federal, state, or local governmental regulatory body against an "Insured" in a "privacy regulatory proceeding". "Regulatory fines and penalties" does not include: 1) any criminal fines or penalties of any nature whatsoever; or 2) "PCI DSS fines and assessments".

"Retroactive date" means the date specified as such in Item 4. of the **CYBER LIABILITY DECLARATIONS**, on or after which "wrongful acts" or "first party insured events" must have taken place to be considered for coverage under this Endorsement.

"Securities" means negotiable or non-negotiable instruments or contracts representing "money" or "other property", but does not include "money".

"Security and privacy wrongful act" means any of the following, whether actual or alleged, but only if committed by an "Insured":

1. The failure to prevent or hinder a "security breach", which in turn results in:

   a. The alteration, copying, corruption, destruction, deletion, or damage to "data" stored on an "insured computer system";

WATFORD000059

     **b.** Theft, loss or unauthorized disclosure of electronic or non-electronic "private information" that is in "your" care, custody or control;

     **c.** Theft, loss or unauthorized disclosure of electronic or non-electronic "private information" that is in the care, custody or control of a "BPO service provider" or an "outsourced IT service provider" that is holding, processing or transferring such "private information" on "your" behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while "your" written contract with such "BPO service provider" or "outsourced IT service provider" is still in effect;

     **d.** "Unauthorized access" to, or "unauthorized use" of, a "computer system" other than an "insured computer system";

     **e.** The inability of an authorized "third party" to gain access to "your" services;

**2.** The failure to timely disclose a "security breach" affecting "private information"; or the failure to dispose of "private information" within the required period, in violation of "privacy regulations";

**3.** The failure to prevent the transmission of a "malicious code" or "computer virus" from an "insured computer system" to the "computer system" of a "third party";

**4.** A "privacy breach";

**5.** The failure to prevent a "privacy breach";

**6.** The failure to prevent or hinder participation by an "insured computer system" in a "denial of service attack" directed against "internet" sites or the "computer system" of a "third party";

**7.** Loss of "personally identifiable information" of "employees"; or

**8.** Infliction of emotional distress or mental anguish, but only if directly resulting from a peril described in **1.** through **7.** above.

"Security breach" means any of the following, whether a specifically targeted attack or a generally distributed attack:

**1.** "Unauthorized access" to, or "unauthorized use" of, an "insured computer system", including "unauthorized access" or "unauthorized use" resulting from the theft of a password from an "insured computer system" or from an "Insured";

**2.** A "denial of service attack" against an "insured computer system";

**3.** Infection of an "insured computer system" by "malicious code" or the transmission of "malicious code" from an "insured computer system"; or

**4.** An event described in **1.** through **3.** above resulting from an "act of cyber terrorism".

A series of continuing "security breaches", related or repeated "security breaches", or multiple "security breaches" resulting from a continuing failure of computer security will be considered a single "security breach" and will be deemed to have occurred at the time the first of such "security breaches" occurred.

"Special expenses" means reasonable and necessary costs and expenses that "you" incur to:

**1.** Prevent, preserve, minimize, or mitigate any further damage to "digital assets", including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts;

**2.** Preserve critical evidence of any criminal or malicious wrongdoing;

**3.** Purchase replacement licenses for "computer programs" because the copy protection system or access control software was damaged or destroyed by a "covered cause of loss"; or

**4.** Notify affected individuals of a total or partial interruption, degradation in service, or failure of an "insured computer system" resulting from a "covered cause of loss".

"Special expenses" does not include:

**1.** The cost(s) of restoring, updating, or replacing "digital assets" to a level beyond that which existed prior to the "covered cause of loss";

**2.** Physical damage to the "computer hardware" or "data" center other than accidental physical damage to, or destruction of, "electronic media" so that stored "digital assets" are no longer machine-readable;

WATFORD000060

3.  Contractual penalties or consequential damages;
4.  Any liability to "third parties" for whatever reason, including, but not limited to, legal costs and expenses of any type;
5.  Fines or penalties imposed by law;
6.  The economic or market value of "digital assets";
7.  Costs or expenses incurred to identify, patch, or remediate software program errors or "computer system" vulnerabilities;
8.  Costs to upgrade, redesign, reconfigure, or maintain an "insured computer system" to a level of functionality beyond that which existed prior to the "covered cause of loss";
9.  Any loss rising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake; or
10. The cost(s) of restoring, replacing or repairing "electronic media".

"Subsidiary" means a legal entity in which the "Named Insured" owns, directly or indirectly, more than fifty percent (50%) of the issued or outstanding voting securities, provided that such entity also:

1.  Was so owned on the effective date of this Endorsement; or
2.  Was created or acquired after the effective date of this Endorsement subject to the limitations of **SECTION VIII – CHANGES IN EXPOSURE**, paragraphs **2**. and **3**.

"Takeover" means:

A.  Any person, entity or affiliated group of persons or entities obtains more than fifty percent (50%) of the "Named Insured's" equity or assets;
B.  Any person, entity or affiliated group of persons or entities obtains the right to elect or appoint more than fifty percent (50%) of the "Named Insured's" directors, officers, trustees or member managers, as applicable;
C.  The "Named Insured" is dissolved, sold or acquired by, merged into, or consolidated with, another entity, such that the "Named Insured" is not the surviving entity; or
D.  The "Named Insured" ceases to do business for any reason.

"Third party", whether singular or plural, means any entity, company, organization or person who does not qualify as an "Insured".

"Unauthorized access" means the gaining of access to a "computer system" by any unauthorized person or persons.

"Unauthorized use" means the use of a "computer system" by any unauthorized person or persons or by any authorized person or persons in an unauthorized manner.

"Vicariously liable" means "your" legal responsibility for the liability of others, including legal responsibility "you" assume in a contract. The existence of vicarious liability will not create or confer any rights or duties under this Endorsement to any "third party", other than as provided in this definition.

"Voluntary notification expenses" means those reasonable and necessary legal expenses, forensic and investigation expenses, postage expenses, and related advertising expenses that "you" incur to notify individuals of a "security breach" or "privacy breach" where there is no specific legal requirement in the applicable jurisdiction mandating such notice. "Voluntary notification expenses" must be incurred with the Company's prior written consent and are subject to the "voluntary notification expenses sublimit".

"Voluntary notification expenses sublimit" means the maximum amount that Company will pay for "voluntary notification expenses".  The "voluntary notification expenses sublimit" is included within, and will erode, the Limits of Liability for Coverage E of this Endorsement.

WATFORD000061

"Waiting period" means:

1.     With respect to Coverage F, the two (2) week period which must elapse after "notification", or in the event of an "adverse media report", after publication of the first "adverse media report", before "brand loss" may be payable. The "waiting period" applies to each "period of indemnity".
2.     With respect to Coverage G.2., the eight (8) hour period which must elapse before "income loss", "interruption expenses" and "special expenses" may be payable. The "waiting period" applies to each "period of restoration".

"Wrongful act" means:

1.     With respect to Coverage A, a "multimedia wrongful act";
2.     With respect to Coverage B, a "security and privacy wrongful act"; and
3.     With respect to Coverage C and Coverage D, a "security breach" or "privacy breach".

"You" and "Your" means the "Named Insured" and any "Subsidiary".

"Your privacy policy" means "your" published policies provided to "employees" or "third parties" in written or electronic form that govern the collection, dissemination, confidentiality, integrity, accuracy or availability of information relating to "private information".

"Your reputation" means the estimation of trust that customers or clients have in doing business with "you" or in purchasing "your" products or services.

## SECTION V – CYBER LIABILITY NOTICE PROVISIONS

The following Notice Provisions will apply only to the coverage provided under this Endorsement and will supersede any other notice provisions contained elsewhere in the Policy.

1.     As a condition precedent to coverage for any "claim", an "executive" must provide written notice to the Company of such "claim" as soon as practicable, but no later than 60 days after expiration of the "endorsement period" (or during the "cyber liability extended reporting period", if applicable).

2.     If, during the "endorsement period", an "executive" becomes aware of any incidents, acts, facts or circumstances that could reasonably be a basis for a "claim", the "executive" must give written notice of the following information to the Company during the "endorsement period":

   1.     Specific details of the incidents, acts, facts or circumstances that could reasonably be the basis for a "claim";
   2.     Possible "damages", penalties, or other amounts potentially covered under this Endorsement that may result or has resulted from the facts or circumstances;
   3.     Details regarding how the "executive" first became aware of the incidents, acts, facts or circumstances; and
   4.     The "computer system" security and event logs, if applicable.

   Any "claim" arising out of such reported incidents, acts, facts or circumstances will be deemed to be a "claim" first made on the date that Company first received written notice complying with the above requirements.

## SECTION VI – CYBER LIABILITY EXTENDED REPORTING PROVISIONS

1.     In the event of cancellation or non-renewal of the Policy either by the "Named Insured" or the Company, the "Named Insured" will have the option to purchase a "cyber liability extended reporting period" effective from the date of Policy cancellation or non-renewal. The additional premium for the

WATFORD000062

"cyber liability extended reporting period" will be a percentage of the full Cyber Liability annual premium in effect on the date the Policy was issued or last renewed, as set forth below:

| Term | Percent of Cyber Annual Premium |
| --- | --- |
| One year (12 months) | 100% |
| Two years (24 months) | 150% |
| Three years (36 months) | 200% |

2. If purchased by the "Named Insured", the "cyber liability extended reporting period" will apply to any "claim" first made during the "cyber liability extended reporting period", but only if the actual or alleged "wrongful acts" or "first party insured events" giving rise to such "claim" occur on or after the "retroactive date" and prior to the end of the "endorsement period". As a further condition precedent to coverage, the "claim" must be reported to the Company in accordance with **SECTION V – CYBER LIABILITY NOTICE PROVISIONS** and will be subject to all other Endorsement terms, conditions and exclusions.

3. To purchase the "cyber liability extended reporting period", the "Named Insured's" written request for the "cyber liability extended reporting period", together with full payment of the additional premium for the "cyber liability extended reporting period", must be received by the Company within 30 days of the effective date of cancellation or non-renewal of the Policy.

4. The Limits of Liability for the "cyber liability extended reporting period" are part of, and not in addition to, the Limits of Liability set forth in Item 1 of the **CYBER LIABILITY DECLARATIONS**.

5. The right to purchase a "cyber liability extended reporting period" will not be available to the "Named Insured" where cancellation or non-renewal of the Policy by the Company is because of non-payment of premium.

6. At the commencement of a "cyber liability extended reporting period", the entire premium will be deemed fully earned, and in the event the "Named Insured" terminates a "cyber liability extended reporting period" for any reason prior to its natural expiration, the Company will not be liable to return any premium paid for the "cyber liability extended reporting period".

## SECTION VII – CYBER LIABILITY EXCLUSIONS

The following exclusions will apply only to the coverage provided under this Endorsement. The exclusions that appear elsewhere in the Policy will not apply to this Endorsement.

The Company will not be liable for any "claim":

1. Based upon, arising from, or in any way involving any actual or alleged "wrongful act" or "first party insured event" which took place, in whole or in part, prior to the "retroactive date".

2. Based upon, arising from, or in any way involving any actual or alleged "wrongful act" or "first party insured event" of which any "Insured" had knowledge prior to the "endorsement period" or prior to the inception date of Cyber Liability insurance issued by the Company of which this Endorsement is a direct and continuous renewal.

3. Based upon, arising from, or in any way involving any "wrongful act" or "first party insured event" which was disclosed or reported to a previous insurer prior to the "endorsement period".

WATFORD000063

4. Made by or on behalf of an "Insured" against another "Insured". This exclusion does not apply to an otherwise covered "claim" under Coverage B which is made by any past, present or future "employee" alleging a "security and privacy wrongful act".

5. Based upon, arising from, or in any way involving any of the following committed by an "Insured", whether acting alone or in collusion with other persons:

   **a.** A willful, intentional, deliberate, malicious, fraudulent, dishonest, or criminal act or omission;
   **b.** Any intentional violation of law;
   **c.** Any intentional violation of "your privacy policy"; or
   **d.** The gaining of any profit or advantage to which an" "Insured" is not legally entitled.

   This exclusion does not apply to "defense costs" or the Company's duty to defend any such "claim" under Coverage A, Coverage B, Coverage C, or Coverage D until the conduct described in this exclusion has been established by a final adjudication in a judicial, administrative or alternative dispute proceeding, or by an "Insured's" own admission in a proceeding or otherwise. The Company will have the right to recover "defense costs" incurred in defending any such "claim" from those parties found to have committed the conduct described in this exclusion.

   This exclusion does not apply to any "Insured" that did not commit, participate in, or have knowledge of any conduct described in this exclusion.

6. Based upon, arising from, or in any way involving activities of an "Insured" as a trustee, partner, officer, director, or employee of any trust, organization, corporation, company or business other than "your" trust, organization, corporation, company or business.

7. Based upon, arising from, or in any way involving the insolvency or bankruptcy of any person or entity, or the failure, inability, or unwillingness of any person or entity to make payments, perform obligations or conduct business because of insolvency, liquidation, or bankruptcy.

8. Based upon, arising from, or in any way involving "bodily injury" or "property damage".

9. Based upon, arising from, or in any way involving:

   **a.** Satellite failures;
   **b.** Electrical or mechanical failures or interruption, including electrical disturbance, spike, brownout, or blackout; or
   **c.** Outages to gas, water, telephone, cable, telecommunication or other infrastructure, unless such infrastructure is under "your" direct operational control and unless such "claim" forms a part of an otherwise covered "first party insured event" under Coverage G.

10. Based upon, arising from, or in any way involving the wear and tear, drop in performance, progressive deterioration, or aging of electronic equipment or "computer hardware" or tangible property used by "you".

11. Based upon, arising from, or in any way involving the failure of overhead transmission and distribution lines.

12. Based upon, arising from, or in any way involving the gradual deterioration of subterranean insulation.

13. Based upon, arising from, or in any way involving fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure, or any other physical event, however caused.

WATFORD000064

14. Based upon, arising from, or in any way involving coupons, prize discounts, prizes, awards, or any valuable consideration given that exceeds the total contracted or expected amount.

15. Based upon, arising from, or in any way involving the actual or alleged inaccurate, inadequate, or incomplete description of the price of goods, products or services.

16. Based upon, arising from, or in any way involving any cost guarantee, cost representation, contract price, or cost estimate being exceeded.

17. Based upon, arising from, or in any way involving the violation of any economic or trade sanctions by the United States government including, but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC). This exclusion does not apply to a "security breach" originating from any country where the United States of America has imposed economic or trade sanctions.

18. Based upon, arising from, or in any way involving any breach of any express, implied, actual or constructive contract, warranty, guarantee or promise.  This exclusion does not apply to:

   a. Any liability or obligation an "Insured" would have had in the absence of such contract, warranty, guarantee or promise and which would have been insured by this Endorsement; or
   b. A breach of "your privacy policy".

19. Based upon, arising from, or in any way involving any liability assumed by any "Insured" under a contract or agreement. This exclusion does not apply to:

   a. With respect to Coverage A and Coverage B only, liability "assumed under contract";
   b. Any liability an "Insured" would have had in the absence of such contract or agreement and which would have been insured by this Endorsement; or
   c. With respect to Coverage D only, liability for "PCI DSS fines and assessments" assumed under a "merchant services agreement".

20. Based upon, arising from, or in any way involving:

   a. Any actual, alleged or threatened presence of pollutants or contamination of any kind, including, but not limited to, asbestos, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste (waste includes materials to be recycled, reconditioned, or reclaimed), whether such presence results from an "Insured's" activities or the activities of others, or such presence or contamination happened suddenly or gradually, accidentally or intentionally, or expectedly or unexpectedly; or
   b. Any directive or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants, or in any way respond to, or assess the effects of, pollutants or contamination of any kind.

21. Based upon, arising from, or in any way involving "income loss" caused by, or resulting from, unauthorized trading. For purposes of this exclusion, unauthorized trading means trading, which at the time of the trade exceeds permitted financial limits or outside of permitted product lines.

22. Based upon, arising from, or in any way involving:

   a. The actual or alleged loss of value of any "securities";
   b. The actual or alleged purchase or sale of "securities";
   c. The offer of, or solicitation of an offer, to purchase or sell "securities"; or
   d. The violation of any securities law including, but not limited to, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, or the Sarbanes-Oxley Act of 2002, or any

WATFORD000065

regulation promulgated under the foregoing statutes, or any similar federal, state, local, or foreign law, including "Blue Sky" laws, whether such law is statutory, regulatory, or common law.

23. Based upon, arising from, or in any way involving the actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as "Racketeer Influenced and Corrupt Organizations Act" or "RICO"), as amended, or any regulation promulgated under the foregoing statute, or any similar federal, state, local or foreign law, whether such law is statutory, regulatory or common law.

24. Based upon, arising from, or in any way involving the actual or alleged government enforcement of any state or federal regulation including, but not limited to, regulations promulgated by the United States Federal Trade Commission, Federal Communications Commission, or the Securities and Exchange Commission. This exclusion does not apply to an otherwise covered "claim" under Coverage C.

25. Based upon, arising from, or in any way involving:

   a. Any employer-"employee" relations, policies, practices, acts, or omissions;
   b. Any actual or alleged refusal to employ any person; or
   c. Any misconduct with respect to "employees".

   This exclusion does not apply to a "claim" resulting from a "privacy breach" that is otherwise covered under Coverage B, Coverage C, or Coverage E.

26. Based upon, arising from, or in any way involving any workers' compensation or similar laws such as the Federal Employers Liability Act.

27. Based upon, arising from, or in any way involving any actual or alleged harassment or discrimination of any kind including, but not limited to, age, color, race, gender, creed, national origin, marital status, sexual preferences, disability, or pregnancy.

28. Based upon, arising from, or in any way involving:

   a. The violation of any pension, healthcare, welfare, profit sharing, mutual, or investment plans, funds, or trusts; or
   b. Any violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments, or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling, or order issued pursuant to the foregoing statutes.

29. Based upon, arising from, or in any way involving labor strikes or similar labor actions.

30. For loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with war, invasion, acts of foreign enemies, hostilities or warlike operations (whether declared or not), civil war or mutiny, civil commotion assuming the proportions of, or amounting to, a riot, popular uprising, military uprising, insurrection, rebellion, revolution, or usurped power or act of terrorism, regardless of any other cause or event contributing concurrently or in any other sequence to the loss; or for loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any action taken by a government authority to hinder, control, prevent, suppress, or defend against any of the aforementioned actions; or the confiscation, nationalization, requisition, or destruction of, or damage to, property by, or under the order of, any government authority. This exclusion does not apply to an "act of cyber terrorism".

WATFORD000066

31.   Based upon, arising from, or in any way involving any commercial decision by any "Insured" to cease providing a product or service, but only if the "Insured" is contractually obligated to continue providing such products or services.

32.   Based upon, arising from, or in any way involving:

   a.   Gambling or pornography; or
   b.   The sale or provision of prohibited, restricted or regulated Items, including, but not limited to, alcoholic beverages, tobacco or drugs.

33.   Based upon, arising from, or in any way involving:

   a.   Any "Insured's" failure to comply with or follow the "PCI Data Security Standard" or any payment card company rules; or
   b.   Any "Insured's" failure to implement or maintain, or comply with, any security measures or standards related to any payment card "data" including, but not limited to, any fine or penalty imposed by a payment card company on a merchant bank or payment processor that an "Insured" has paid or agreed to reimburse or indemnify.

   This exclusion does not apply to an otherwise covered "PCI DSS demand" under Coverage D.

34.   Based upon, arising from, or in any way involving:

   a.   Any actual or alleged unfair competition, price fixing, deceptive trade practices or restraint of trade; or
   b.   The violation of any antitrust statute, legislation or regulation.

   This exclusion does not apply to allegations of unfair competition that form a part of an otherwise covered "claim" under Coverage A. This exclusion does not apply to allegations of deceptive trade practices that form a part of an otherwise covered "claim" under Coverage B.

35.   Based upon, arising from, or in any way involving any actual or alleged infringement of any patent.

36.   Based upon, arising from, or in any way involving the misappropriation, theft, copying, display or publication of any trade secret. This exclusion does not apply to an otherwise covered "claim" under Coverage B alleging failure to prevent the misappropriation of a trade secret which results from a "security and privacy wrongful act".

37.   Based upon, arising from, or in any way involving the manufacturing, mining, use, sale, installation, removal or distribution of, or exposure to, asbestos, materials or products containing asbestos, or asbestos fibers or dust.

38.   Based upon, arising from, or in any way involving the confiscation, commandeering, requisition, destruction of, or damage to, "computer hardware" by order of a government de jure or de facto, or by any public authority for whatever reason.

39.   Based upon, arising from, or in any way involving:

   a.   Any actual, alleged or threatened presence, of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro-organisms of any type, nature or description;
   b.   Any cost, expense, or charge, fine or penalty incurred or sustained, or imposed by order, direction, request, or agreement of any court, governmental agency, or any civil, public, or military authority, to test for, monitor, clean up, remediate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to, or assess, the effects of mold, mildew, spores,

WATFORD000067

mycotoxins, fungi, organic pathogens, or other microorganisms of any type, nature, or description.

For purposes of this exclusion, organic pathogens mean any organic irritant or contaminant including, but not limited to, mold, fungus, bacteria, virus, or their byproducts such as mycotoxins, mildew, or biogenic aerosol. Organic pathogens includes, but is not limited to, Aspergillus, Penicillium, Stachybotrys Chartarum, Stachybotrys Atra, Trichoderma, Fusarium, and Memnoniella.

40. Based upon, arising from, or in any way involving the existence, emission, or discharge of any electromagnetic field, electromagnetic radiation, or electromagnetism, which actually or allegedly affects the health, safety, or condition of any person or the environment, or that affects the value, marketability, condition or use of any property.

41. Based upon, arising from, or in any way involving:

    **a.**    ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel; or

    **b.**    the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.

42. Based upon, arising from, or in any way involving any actual or alleged violation of the Telephone Consumer Protection Act (47 U.S.C.§227), the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101-6108), or the CAN-SPAM Act (15 U.S.C. §§ 7701-7713), each as amended, or any regulations promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such laws are statutory, regulatory or common law, including any anti-spam law or other law concerning the use of telephonic or electronic communications for solicitation purposes, or any allegations of invasion or violation of any rights to privacy derived therefrom. This exclusion does not apply to an otherwise covered "claim" under Coverage B or Coverage C alleging a violation of the CAN-SPAM Act, as amended, or any regulations promulgated thereunder, or any similar federal, state, local or foreign law, whether such law is statutory, regulatory or common law, but only if such violation arises out of a "security breach".

43. With respect to Coverage F (BrandGuard®), for:

    **a.**    Any loss, cost, liability or expense that "you" incur to re-establish "your reputation", including "public relations expenses";

    **b.**    Any loss, cost, liability or expense incurred in any "claim" that is insured by any other insurance, except excess insurance;

    **c.**    Any loss, cost, liability or expense incurred because of an "adverse media report" that also affects or refers in similar terms to a general security issue, an industry, or "your" specific competitors without any specific allegations regarding a "security breach" or a "privacy breach" committed by an "Insured", or by others acting on "your" behalf, for whom "you" are legally responsible, including "BPO service providers" or "outsourced IT service providers";

    **d.**    Any liability to "third parties" for whatever reason, including, but not limited to, legal costs and expenses of any type;

    **e.**    Contractual penalties or consequential damages;

    **f.**    "Notification expenses", "breach support and credit monitoring expenses" or "privacy breach response costs" paid or payable under Coverage E; or

    **g.**    Fines or penalties imposed by law or regulation.

## SECTION VIII – CHANGES IN EXPOSURE

1. In the event of a "takeover" during the "endorsement period", coverage under this Endorsement will continue until its natural expiration date for any "claim" made during the "endorsement period", but

WATFORD000068

only if the actual or alleged "wrongful acts" or "first party insured events" giving rise to such "claim" occur on or after the "retroactive date" and prior to the effective date of the "takeover".

2.  If, after the inception of the "endorsement period", the "Named Insured" acquires or creates a "Subsidiary", and we have agreed, by endorsement to the Policy, to provide coverage for such "Subsidiary", then such "Subsidiary" will be included within the definition of "Insured", but only with respect to "claims" for actual or alleged "wrongful acts" or "first party insured events" that occur after the effective date of the creation or acquisition of such "Subsidiary".

3.  If, after the inception of the "endorsement period", the "Named Insured" sells a "Subsidiary", that "Subsidiary" will be an "Insured", but only with respect to "claims" for actual or alleged "wrongful acts" or "first party insured events" that occur on or after the "retroactive date" and prior to the effective date of the sale.

## SECTION IX – LOSS DETERMINATION

1.  **Brand Loss.**  The "brand loss" payable under Coverage F will be calculated by considering:

    a.  The prior experience of "your" business preceding the date of the "adverse media report" or "notification", whichever applies, and "your" likely net profit, had no "adverse media report" been published or "notification" occurred;
    b.  Income derived from substitute methods, facilities, or personnel "you" use to maintain "your" revenue stream;
    c.  "Your" documentation of the trends in "your" business and variations in, or other circumstances affecting, "your" business before or after the "adverse media report" or "notification", which would have affected "your" business had no "adverse media report" been published or "notification" occurred; and
    d.  "Your" fixed operating expenses (including ordinary payroll), but only to the extent that such fixed operating expenses must continue during the "period of indemnity".

    For purposes of calculating "brand loss", "net profit" will include the amount paid or payable to "you" for goods, products, or services sold, delivered, or rendered in the normal course of "your" business.

2.  **Digital Assets Loss.**  The "digital assets loss" payable under Coverage G.1. will be determined as follows:

    a.  If the impacted "digital asset" was purchased from a "third party", we will pay only the lesser of the original purchase price of the "digital asset" or the reasonable and necessary "digital assets loss".
    b.  If it is determined that the "digital assets" cannot be replaced, restored or recreated, we will only reimburse the actual and necessary "digital assets loss" incurred up to such determination.

3.  **Income Loss.**  The "income loss" payable under Coverage G.2. will be calculated as follows:

    a.  "Your" net profit, as could have been reasonably projected, but which has been lost as a direct result of a "covered cause of loss"; plus
    b.  "Your" fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such fixed operating expenses must continue during the "period of restoration".

    "Income loss" will be calculated by considering:

    a.  The prior experience of "your" business preceding the date of the "covered cause of loss", and "your" likely net profit, had no "covered cause of loss" occurred;

WATFORD000069

    **b.**    Income derived from substitute methods, facilities, or personnel "you" use to maintain "your" revenue stream; and

    **c.**    "Your" documentation of the trends in "your" business and variations in, or other circumstances affecting, "your" business before or after the "covered cause of loss", which would have affected "your" business had no "covered cause of loss" occurred.

For purposes of calculating "income loss", **"**net profit" will include the amount paid or payable to "you" for goods, products, or services sold, delivered, or rendered in the normal course of "your" business.

## SECTION X – TRANSFER OF DUTIES WHEN THE LIMITS OF INSURANCE ARE EXHAUSTED

The following Transfer of Duties When the Limits of Insurance Are Exhausted provisions will apply only to the coverage provided under this Endorsement and will supersede any similar provisions contained elsewhere in the Policy.

**1.**    If the Company concludes that, based on "claims" which have been reported, the Limits of Liability set forth in the **CYBER LIABILITY DECLARATIONS** are likely to be used up in payment of covered amounts, the Company will notify the "Insured" to that effect.

**2.**    When the Limits of Liability have been exhausted:

    **a.**    The Company will notify the "Insured" in writing as soon as practicable that: (a) such Limits of Liability have been exhausted; and (b) the Company's obligation to defend any "claim" or pay any amounts has ended.

    **b.**    The Company will initiate and cooperate in the transfer of control to the appropriate "Insured" all "claims" which are subject to the Limits of Liability and were reported to the Company before the Limits of Liability were exhausted. "You", and any other "Insured", must cooperate in the transfer of control of said "claims". "You", and any other "Insured" involved in a "claim", must arrange for the defense and payment of such "claim" within the period agreed to by the appropriate "Insured" and the Company. Absent any such agreement, arrangements for defense and payment of the "claim" must be made as soon as practicable. The Company will take such steps as deemed appropriate to avoid default in, or continue the defense or handling of, such "claim" until transfer of control is completed, provided the "Insured" is cooperating in completing such transfer.

    **c.**    The "Insured" will reimburse the Company for costs it incurs in transferring control of a "claim". The Company will take no action whatsoever with respect to any "claim" that would have been subject to the Limits of Liability had they not been exhausted, if the "claim" is reported to the Company after the Limits of Liability have been exhausted.

    **d.**    The "Insured" will also be responsible for providing "notification" and customer support, including credit monitoring services and identity theft education or assistance, to affected individuals. The "Insured" may continue to utilize vendors recommended by the Company to provide such services.

    **e.**    The exhaustion of the Limits of Liability and the resulting end of the Company's obligation to defend any "claim" or pay any amount will not be affected by the Company's failure to comply with any of the provisions of this section.

## SECTION XI – OTHER INSURANCE

The coverage provided by this Endorsement will be excess insurance over any other valid and collectible insurance available, including any self-insured retention or deductible portion thereof, whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such insurance specifically applies as excess insurance over the insurance provided under this Endorsement.

WATFORD000070

**SECTION XII – ARBITRATION**

Notwithstanding any other provision of this Endorsement or the Policy, any irreconcilable dispute between the Company and an "Insured" concerning this Endorsement or coverage for any "claim" is to be resolved by arbitration in accordance with the then current rules of the American Arbitration Association, except that the arbitration panel shall consist of one arbitrator selected by the "Insured", one arbitrator selected by the Company, and a third independent arbitrator selected by the first two arbitrators. Judgment upon the award may be entered in any court having jurisdiction. The arbitrator has the power to decide any dispute between the Company and the "Insured" concerning the application or interpretation of this Endorsement. However, the arbitrator shall have no power to change or add to the provisions of this Endorsement. The "Insured" and the Company will share equally in the cost of arbitration.

WATFORD000071

POLICY NUMBER: ERGL00145900

**COMMERCIAL GENERAL LIABILITY**
**ER GLD 07 17**

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

<table>
<tr>
<td>

**Watford Specialty Insurance Company**
**445 South Street**
**Suite 220**
**P.O. Box 1988**
**Morristown, NJ 07962-1988**
**877-590-5611**

</td>
<td>

**Rockwell Group Ltd**
**640 Fulton Street Suite-4**
**Farmingdale, NY 11735**
**516-454-6364**

</td>
</tr>
</table>

NAMED INSURED:    MRJC, Inc. DBA: That Meetball Place

MAILING ADDRESS:    52-54 West Main St., Patchogue, NY 11772

POLICY PERIOD:  FROM  12-12-2019         TO    12-12-2020         AT 12:01 A.M.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| **LIMITS OF INSURANCE** | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 100,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $ Excluded | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 2,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |

| | |
|---|---|
| LOCATION OF BUSINESS: | **SEE FORM: ER 10 34 04 14** |
| BUSINESS DESCRIPTION: | Lounge |
| THE NAMED INSURED IS A: | Organization |

WATFORD000072

| | CLASSIFICATION AND PREMIUM | | | | | | |
|---|---|---|---|---|---|---|---|
| LOC # | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops |
| 1 | Restaurants- With sale of alcoholic beverages that are 30% or more but less than 75% of the total annual receipts of the restaurant- With Dance Floor  10.578 | 16915 | 920,000 | | 0.508 | ■■■■ | ■■■■ |
| 1 | Additional Insured- Managers or Lessors of Premises | AI-MALS | 1 | 100 | INCL | 100 | INCL |
| All | Cyber Liability | CYBER | If Any | INCL | INCL | INCL | INCL |
| All | Deadly Weapon Protection | DWP | If Any | INCL | INCL | INCL | INCL |
| 1 | | | | | | | |

|  |  |
|---|---|
| TOTAL PREMIUM (SUBJECT TO AUDIT) | $ ■■■■■■ |
| PREMIUM SHOWN IS PAYABLE:     AT INCEPTION | $ ■■■■■■ |

| AUDIT PERIOD (IF APPLICABLE) | ☒ ANNUALLY | ☐ SEMI-AN-NUALLY | ☐ QUARTERLY | ☐ MONTHLY |
|---|---|---|---|---|

---

**FORMS APPLICABLE TO COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**SEE FORM: ER SGLF 04 14**

---

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

WATFORD000073

POLICY NUMBER: ERGL00145900

**ER SGLF 04 14**

## General Liability Policy Forms

| | |
|---|---|
| ER GLD 07 17 | Commercial General Liability Declarations |
| ER SGLF 04 14 | Schedule of General Liability Forms |
| ER 01 09 16 | Commercial General Liability Coverage Form |
| CG 21 65 12 04 | Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception And A Hostile Fire Exception |
| ER 10 11 04 14 | Cross Suits Exclusion |
| ER 10 18 04 14 | Pyrotechnics and Fireworks Exclusion |
| ER 10 23 04 14 | Injury to Contractors Exclusion |
| ER 10 26 06 16 | Exclusion of Nuclear, Biological, Chemical or Radiological Acts |
| ER 20 05 10 15 | Sublimit Assault or Battery |

Page **1** of **1**

WATFORD000074

COMMERCIAL GENERAL LIABILITY
ER 01 09 16

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B.**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

WATFORD000075

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury", "property damage", or "personal and advertising injury" expected or intended from the standpoint of any insured, or any insured's "employees", contractors, or agents.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol; or

**(c)** Failing to prevent any person who may be under the influence of alcohol from driving;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

An insured who permits any person to bring any alcoholic beverage on to their premises, for consumption on the premises, whether or not a fee is charged for such activity, will also be considered selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

WATFORD000076

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

WATFORD000077

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

Any claim, loss, "suit", "bodily injury" or "property damage" arising directly or indirectly out of the ownership, operation, maintenance, or use of an "auto", aircraft or watercraft.

**h. Mobile Equipment**

Any claim, loss, "suit", "bodily injury" or "property damage" arising directly or indirectly out of the ownership, operation, maintenance, or use of "mobile equipment".

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

WATFORD000078

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**r. Discrimination**

Any claim, loss, "suit", "bodily injury", or "property damage", arising directly or indirectly from:

**(1)** the actual or alleged discrimination of any person or persons based upon, but not limited to, color, creed, gender, race, natural origin, age, disability, handicap, illness, religion, or sexual preference; or

**(2)** the actual or alleged failure to comply with the Americans with Disabilities Act or any other similar federal, state or municipal laws.

**s. Employment Related Practices**

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

WATFORD000079

**(2)** Whether the insured may be liable as an employer or in any other capacity; or

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**t.  Lead**

Any loss, claim, "suit", "bodily injury", or "property damage" arising directly or indirectly out of lead.

This exclusion applies to past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, inhalation of, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of, or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, transmitted in any fashion or found in any form whatsoever.

**u.  Asbestos**

Any loss, claim or "suit" for "bodily injury", or "property damage", directly or indirectly out of asbestos in any manner or form, including without limitation:

**(1)** any cost or expense relating to investigation and/or defense of any loss, claim, "suit" or other proceeding; or

**(2)** any cost or expense relating to request, demand or order that any insured or others test for, monitor, remediate, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the presence of or the effects of asbestos; and/or

**(3)** any fine, penalty or assessment.

**v.  Fungi or Bacteria**

Any loss, claim or "suit" for "bodily injury" or "property damage", which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

We have no obligation to defend or indemnify any insured for any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**w. Silica or Silica Related Dust**

**(1)** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**(2)** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**(3)** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**x. Securities**

Any claim, loss, "suit", "bodily injury" or "property damage" based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of:

**(1)** The Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, any other federal law, rule or regulation with respect to the regulation of securities, any rules or regulations of the United States Securities and Exchange Commission, or any amendment of such laws, rules or regulations; or'

**(2)** Any state securities or "Blue Sky" laws or rules or regulations or any amendment of such laws, rules or regulations; or

**(3)** Any provision of the common law imposing liability in connection with the offer, sale or purchase of securities.

WATFORD000080

**y. Professional Services**

Any claim, loss, "suit", "bodily injury" or "property damage" arising out of the rendering of, or failure to render, any service or advice relating to "professional services".

**z. Communicable Disease**

Any loss, claim, "suit", "bodily injury" or "property damage" arising directly or indirectly out of actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**(1)** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**(2)** Testing for a communicable disease;

**(3)** Failure to prevent the spread of the disease; or

**(4)** Failure to report the disease to authorities.

**aa. Chromated Copper Arsenate**

"Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of or caused directly or indirectly, in whole or in part, by the use or existence of:

**(1)** Chromated copper arsenate; or

**(2)** Any product or material which contains chromated copper arsenate; or

**(3)** Any product or material to which chromated copper arsenate has been applied by any party (including, but not limited to, any manufacturer, processor or distributor of such products or materials).

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" actually or allegedly caused by or at the direction of the insured, any insured's "employees", contractors, or agents with the actual or alleged knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

WATFORD000081

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

**(1)** "Personal and advertising injury" arising out of the actual or alleged infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

**(2)** "Personal and advertising injury" arising out of the actual or alleged use of another's images, photographs, likenesses or personal attributes whether altered or unaltered.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
**ER 01 09 16**

WATFORD000082

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**q. Employment Related Practices**

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**r. Lead**

"Personal and advertising injury" arising directly or indirectly out of lead.

This exclusion applies to past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, inhalation of, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of, or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, transmitted in any fashion or found in any form whatsoever.

**s. Asbestos**

"Personal and advertising injury" directly or indirectly out of asbestos in any manner or form, including without limitation:

    **(1)** Any cost or expense relating to investigation and/or defense of any loss, claim, "suit" or other proceeding; or

    **(2)** Any cost or expense relating to request, demand or order that any insured or others test for, monitor, remediate, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the presence of or the effects of asbestos; and/or

    **(3)** Any fine, penalty or assessment.

**t. Fungi or Bacteria**

"Personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

We have no obligation to defend or indemnify any insured for any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**u. Silica or Silica Related Dust**

WATFORD000083

**(1)** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**(2)** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**v. Professional Services**

Any claim, loss, "suit", "bodily injury" or "property damage" arising out of the rendering of, or failure to render, any service or advice relating to "professional services".

**w.  Communicable Disease**

"Personal and advertising injury" arising directly or indirectly out of actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**(1)** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**(2)** Testing for a communicable disease;

**(3)** Failure to prevent the spread of the disease; or

**(4)** Failure to report the disease to authorities.

**x. Chromated Copper Arsenate**

"Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of or caused directly or indirectly, in whole or in part, by the use or existence of:

**(1)** Chromated copper arsenate; or

**(2)** Any product or material which contains chromated copper arsenate; or

**(3)** Any product or material to which chromated copper arsenate has been applied by any party (including, but not limited to, any manufacturer, processor or distributor of such products or materials).

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

WATFORD000084

**f.** The indemnitee:

  **(1)** Agrees in writing to:

    **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

    **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

    **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

  **(2)** Provides us with written authorization to:

    **(a)** Obtain records and other information related to the "suit"; and

    **(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

  **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

  **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

  **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

  **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

  **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

  **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

However, none of these "employees" or "volunteer workers" are insureds for:

  **(1)** "Bodily injury" or "personal and advertising injury":

    **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

    **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

    **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

    **(d)** Arising out of his or her providing or failing to provide professional health care services.

  **(2)** "Property damage" to property:

    **(a)** Owned, occupied or used by;

    **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

WATFORD000085

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of damages under Coverage **A** because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

ER 01 09 16

WATFORD000086

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

WATFORD000087

**5.Premium Audit**

   **a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

   **b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill.

   **c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

   **a.** The statements in the Declarations are accurate and complete;

   **b.** Those statements are based upon representations you made to us; and

   **c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

   **a.** As if each Named Insured were the only Named Insured; and

   **b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   **b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

   **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

   **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

   **c.** All other parts of the world if the injury or damage arises out of:

     **(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

     **(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

     **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

WATFORD000088

8. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

9. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

10. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. A contract specifically endorsed to this policy as an "insured contract".

11. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

13. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   (1) Equipment designed primarily for:

      (a) Snow removal;

      (b) Road maintenance, but not construction or resurfacing; or

      (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

WATFORD000089

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

15. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

   **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

   **f.** Oral or written publication, in any manner, of another's images, photographs, likenesses or personal attributes.

16. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

17. "Products-completed operations hazard":

   **a.** Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

   **b.** Does not include "bodily injury" or "property damage" arising out of:

      **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

      **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

18. "Professional Services" means an act or service arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

19. "Property damage" means:

   **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

   For the purposes of this insurance, electronic data is not tangible property. As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

20. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

21. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

22. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

23. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.       **ER 01 09 16**

WATFORD000090

**24.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**25.** "Your product":

   **a.** Means:

      **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         **(a)** You;

         **(b)** Others trading under your name; or

         **(c)** A person or organization whose business or assets you have acquired; and

      **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      **(2)** The providing of or failure to provide warnings or instructions.

   **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**26.** "Your work":

   **a.** Means:

      **(1)** Work or operations performed by you or on your behalf; and

      **(2)** Materials, parts or equipment furnished in connection with such work or operations.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      **(2)** The providing of or failure to provide warnings or instructions.

WATFORD000091

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

© ISO Properties, Inc., 2003

WATFORD000092

Form: ER 10 11 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CROSS SUITS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim or "suit" for "bodily injury", "property damage" or "personal and advertising injury" sustained by any insured whether or not such "bodily injury", "property damage" or "personal and advertising injury" arising out of the activities or operations of any other insured.

This exclusion does not apply if:

1. Any named insured has assumed liability for such claims or "suits" in a contract or agreement that is an "insured contract"; and
2. The person or entity bringing the claim or "suit" is not an entity, under any common ownership with or control by any person or entity qualifying as an insured under this policy.

All other terms and conditions of the policy remain the same.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000093

Form: ER 10 18  04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PYROTECHNICS OR FIREWORKS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage", "injury" or "personal injury and advertising injury", actually or allegedly resulting directly or indirectly from the use, transportation, or storage of "pyrotechnics".

As used in this endorsement "pyrotechnics" includes, but is not limited to, airbursts, binary powders, comets, mines, preloaded smoke pots, concussions, falls, fire balls, mortar hits, flame projectors, torches, flash cotton, flash paper, flash trays, gerbs, lances, line rockets, multi-tube articles, pre-mixed powders, squibs, Saxons, or any item which contains gun powder or other chemical(s) that react(s) creating heat, combustion or explosion.

This endorsement does not apply to flash pots or sparklers.

WATFORD000094

Form: ER 10 23 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# INJURY TO CONTRACTORS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", or "personal injury and advertising injury", actually or allegedly resulting directly or indirectly:

(1)  to any contactor hired or retained if the injury arises out of or in the course of  the contractor's employment or retention; or

(2)  to an employee of any contractor, if the injury arises out of or in the course of the employment or retention of such contractor for which any insured may become liable in any capacity; or

(3)  to the spouse, child, parent, brother or sister of any contractor or employee of any contractor for injury arising out of or in the course of the employment or retention of such contractor for which any insured may become liable in any capacity; or

(4)  for any obligation as an employer or in any other capacity to indemnify or contribute with or repay anyone who must pay damages because of an injury to any contractor or employee of any contractor.


This exclusion applies whether the contractor was retained or hired by you, your employees, your representatives, your tenants or any contractor.

Page **1** of **1**

WATFORD000095

Form: ER 10 26 06 16

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOLOGICAL ACTS

This endorsement modifies and amends insurance provided under the following:

GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

This insurance does not apply to:

Any loss, claim, "suit", "bodily injury" or "property damage" arising directly or indirectly, out of:

1. The release or escape of nuclear materials, or
2. A nuclear reaction, or
3. Radiation or radioactive contamination; or
4. The dispersal or application of pathogenic or poisonous biological or chemical materials; or
5. The release of pathogenic or poisonous biological or chemical materials.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

WATFORD000096

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED COVERAGE ASSAULT OR BATTERY RELATED CLAIMS

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

In consideration of premiums paid, it is agreed that the specific coverage excluded by Form ER 10 05 10 15, Assault or Battery Exclusion is reinstated on a limited basis in accordance with the following additional terms and conditions:

Subject to the limits set forth below this insurance applies to any loss, claim, "suit" or expense for "bodily injury", "property damage", or "personal and advertising injury" including claims or "suits" for negligence, directly or indirectly arising out of, actually or allegedly arising out of, or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution or threat; whether committed by a patron, employee, or any other individual.

This endorsement applies regardless of fault or intent.

For purposes of this endorsement, negligence includes but is not limited to allegations or claims for: negligent hiring, negligent employment, negligent training, negligent supervision, failure to intervene, failure to render aid, failure to contact law enforcement, failure to contact emergency medical services or failure to detain potentially responsible parties.

Solely as to the coverage provided by this endorsement the phrase "These payments will not reduce the limits of insurance" is deleted in its entirety from "SUPPLEMENTARY PAYMENTS-COVERAGES A AND B".

Payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" to which this endorsement applies shall not exceed the limits of liability set forth below:

      Per Occurrence:  $500,000

      Aggregate Limit:  $500,000

      Deductible:  $0

NOTICE: The limit of liability available to pay judgments and settlements is reduced by the payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)".  We will not be obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend any loss, claim or "suit" after the applicable limit of our liability has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses.

The Per Occurrence Limit is the most we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in any one claim and/or "suit". All claims for damages made by one or more persons because of any one act or series of acts to which this endorsement applies shall be deemed to be one claim.

The Aggregate Limit is the most, subject to the Each Occurrence Limit, we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in a claim and/or "suit" regardless of how many persons assert claims and/or "suits" against you, any insured or any person.

Page **1** of **2**

WATFORD000097

FORM: 20 05 10 15

The Each Occurrence and Aggregate Limits described above are the most we will pay regardless of the number of insureds. These Limits of Insurance are subject to and not in addition to the General Aggregate Limit shown in the Declarations of the policy. Payments under these Limits of Insurance are part of and decrease the policy General Aggregate Limit of Insurance shown in the Declarations.

**Liquor Liability Assault and Battery Coverage**

If, on the date of an "occurrence" to which this endorsement applies, you had a policy of insurance providing Liquor Liability Coverage with us in full force and effect, **Exclusion C. Liquor Liability** does not apply, solely with regard to the coverage provided by this endorsement.

**Two or More Coverage Forms**

If this Coverage Form and any other Coverage Form or policy under which you are an insured, issued by us or companies affiliated with us, apply to the same "occurrence", the Per Occurrence and Aggregate Limit shown on this form is the applicable limit for the "occurrence" and SUPPLEMENTARY PAYMENTS-COVERAGES A AND B does not apply.

Page **2** of **2**

WATFORD000098

COMMERCIAL GENERAL LIABILITY
ER LLD 07 17

POLICY NUMBER: ERGL00145900

# LIQUOR LIABILITY DECLARATIONS

| | |
|---|---|
| **Watford Specialty Insurance Company**<br>**445 South Street**<br>**Suite 220**<br>**P.O. Box 1988**<br>**Morristown, NJ 07962-1988**<br>**877-590-5611** | **Rockwell Group Ltd**<br>**640 Fulton Street Suite-4**<br>**Farmingdale, NY 11735**<br>**516-454-6364** |

| | |
|---|---|
| NAMED INSURED | MRJC, Inc. DBA: That Meetball Place |
| MAILING ADDRESS | 52-54 West Main St., Patchogue, NY 11772 |

POLICY PERIOD:   FROM 12-12-2019        TO  12-12-2020        AT 12:01 A.M.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | |
|---|---|
| EACH COMMON CAUSE  LIMIT | $  1,000,000 |
| AGGREGATE LIMIT | $  1,000,000 |

| | |
|---|---|
| LOCATION OF BUSINESS: | **SEE FORM: ER 10 34 04 14** |
| BUSINESS DESCRIPTION: | Lounge |
| THE NAMED INSURED IS A: | Organization |

| CLASSIFICATION AND PREMIUM | | | | |
|---|---|---|---|---|
| **CLASSIFICATION** | **CODE NO.** | **PREMIUM BASE** | **RATE** | **ADVANCE PREMIUM** |
| Restaurants, Taverns, Hotels, Motels Including Package Sales | 58161 | $ 350,000 | 10.269 | ███████ |
| | | $ | | $ |
| | STATE TAX OR OTHER (if applicable) | | $ | |
| | TOTAL PREMIUM (SUBJECT TO AUDIT) | | $ ███████ | |
| PREMIUM SHOWN IS PAYABLE: | AT INCEPTION | | $ ███████ | |

| AUDIT PERIOD (IF APPLICABLE) | ☒ ANNU-ALLY | ☐ SEMI-AN-NUALLY | ☐ QUARTERLY | ☐ MONTHLY |
|---|---|---|---|---|

WATFORD000099

| FORMS APPLICABLE TO ALL COVERAGE PARTS: |
|---|
|     REFER TO FORM: ER SLLF 04 14 |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

WATFORD000100

POLICY NUMBER:  ERGL00145900                                    **ER SLLF 04 14**

## Liquor Liability Policy Forms

ER LLD 07 17              Liquor Liability Declarations

ER SLLF 04 14            Schedule of Liquor Liability Forms

ER 02 10 15              Liquor Liability Coverage Form

Page **1** of **1**

WATFORD000101

# LIQUOR LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – LIQUOR LIABILITY COVERAGE

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "injury" to which this insurance applies if liability for such "injury" is imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "injury" to which this insurance does not apply. We may, at our discretion, investigate any "injury" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

If we initially defend an "insured" or pay for an "insured's" defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

**b.** This insurance applies to "injury" only if:

**(1)** The "injury" occurs during the policy period in the "coverage territory"; and

**(2)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "injury" or claim, knew that the "injury" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "injury" occurred, then any continuation, change or resumption of such "injury" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Injury" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim, includes any continuation, change or resumption of that "injury" after the end of the policy period.

**d.** "Injury" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim:

**(1)** Reports all, or any part, of the "injury" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "injury"; or

**(3)** Becomes aware by any other means that "injury" has occurred or has begun to occur.

An insured who permits any person to bring any alcoholic beverage on their premises, for consumption on the premises, whether or not a fee is charged for such activity, will also be considered selling, serving or furnishing alcoholic beverages.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

WATFORD000102

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Injury" expected or intended from the standpoint of the insured or any insured's "employees", contractors, or agents.

**b. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**c. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the "injury".

**d. Liquor License Not In Effect**

"Injury" arising out of any alcoholic beverage sold, served or furnished while any required license is not in effect.

**e. Your Product**

"Injury" arising out of "your product". This exclusion does not apply to "injury" for which the insured or the insured's indemnitees may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

**f. Other Insurance**

Any "injury" with respect to which other insurance is afforded, or would be afforded but for the exhaustion of the limits of insurance.

This exclusion does not apply if the other insurance responds to liability for "injury" imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage.

**g. War**

"Injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**h. Professional Services**

Any claim, loss, "suit", "bodily injury," "property damage," "injury" or "personal and advertising injury" arising out of the rendering of, or failure to render, any service or advice relating to "professional services".

**i. Communicable Disease**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal or advertising injury" arising directly or indirectly out of actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**(1)** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**(2)** Testing for a communicable disease;

**(3)** Failure to prevent the spread of the disease; or

**(4)** Failure to report the disease to authorities.

**j. Contractual Liability**

"Injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

WATFORD000103

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "injury" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "injury", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

## SUPPLEMENTARY PAYMENTS

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**d.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**e.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**f.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

**g.** Expenses incurred by the insured for first aid administered to others at the time of an event to which this insurance applies.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
WATFORD000104

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   **a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

   **(1)** "Injury":

   **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

   **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above; or

   **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)** above.

   **(2)** "Property damage" to property:

   **(a)** Owned or occupied by; or

   **(b)** Rented or loaned;

   to that "employee", any of your other "employees", by any of your partners or members (if you are a partnership or joint venture), or by any of your members (if you are a limited liability company).

   **b.** Any person or organization having proper temporary custody of your property if you die, but only:

   **(1)** With respect to liability arising out of the maintenance or use of that property; and

   **(2)** Until your legal representative has been appointed.

   **c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for all "injury" as the result of the selling, serving or furnishing of alcoholic beverages.

3. Subject to the Aggregate Limit, the Each Common Cause Limit is the most we will pay for all "injury" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
WATFORD000105

## SECTION IV – LIQUOR LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Injury, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "injury" which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "injury" took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any "injury".

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury" to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary. Our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

**b. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

### 5. Premium Audit

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### 6. Representations

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

WATFORD000106

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**2.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the "injury" occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the "injury" arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above; or

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**3.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**4.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**5.** "Injury" means damages because of "bodily injury" and "property damage", including damages for care, loss of services or loss of support.

**6.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** A contract specifically endorsed to this policy as an "insured contract".

**6.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**7.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

**8.** "Suit" means a civil proceeding in which damages because of "injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

 Includes copyrighted material of Insurance Services Office, Inc. with its permission. **ER 02 10 15**

WATFORD000107

**9.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**10.** "Your product":

  **a.** Means:

    **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      **(a)** You;

      **(b)** Others trading under your name; or

      **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

WATFORD000108